# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

WAEL MUHAMMAD BAZZI,              )
                                 )
          Plaintiff,             )
                                 )
     v.                          )          Civil Action No. 1:19-cv-01940
                                 )
ANDREA M. GACKI, Director,       )
Office of Foreign Assets Control, *et al*. )
                                 )
                                 )
          Defendants.            )
_____)

## CERTIFICATION OF ADMINISTRATIVE RECORD

I, Ripley Quinby, declare as follows:

1.   I am currently employed as the acting Deputy Associate Director in the Office of Global

Targeting at the U.S. Department of the Treasury, Office of Foreign Assets Control (OFAC).

2.   I have been with OFAC as either a contractor or an OFAC government employee since

2015, first as a Sanctions Investigator and later as a Section Chief for OFAC's Strategic

Targeting Section, before assuming my current position.  In my present role, I oversee the

production of evidentiary memoranda for the purposes of sanctions actions across all of OFAC's

sanctions programs, including those pursuant to Executive Order 13224 of September 23, 2001,

"Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to

Commit, or Support Terrorism," as amended by Executive Order 13886 of September 9, 2019,

"Modernizing Sanctions To Combat Terrorism."  Further, I supervise the provision of the

unclassified, non-privileged version of the evidentiary memoranda to designees and their

counsel, upon request. As such, I am authorized to certify the truth and correctness of official records of OFAC, and of other documents recorded or filed with OFAC.

3. The facts attested to herein are based on my personal knowledge or information made available to me in the course of my official duties.

4. I hereby certify to the best of my knowledge and belief that the documents described in the attached index constitute a true, correct, and complete copy of the non-privileged documents that were directly or indirectly considered in connection with OFAC's decision to designate Plaintiff Wael Muhammad Bazzi. OFAC redacted the administrative record and index to remove classified, privileged, or otherwise protected information before production to Plaintiff Bazzi. Also prior to production, OFAC redacted non-responsive information about designated entities that are not parties to this lawsuit.

In accordance with 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Dated: September 30, 2019

Ripley Quinby
Acting Deputy Associate Director
Office of Global Targeting
Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Freedman's Bank Building
Washington, DC 20220

SECRET

## (U) Certified Index – *Wael Bazzi v. Gacki, et al.*, 19-01940 (D.D.C.)

Bates No(s).

A.    (U) Press Release                                                              0001-0008

B.    (U) Blocking Memorandum                                             0009-0011

C.    (U) Revised Blocking Memorandum                              0012-0014

D.    (U) Federal Register Notice                                             0015-0016

E.    (U) Evidentiary Memorandum and Exhibit List             0017-0029

    Ex.1    (U) Executive Order 13224 of September 23, 2001, "Blocking          0030-0035
        Property and Prohibiting Transactions With Persons Who Commit,
        Threaten to Commit, or Support Terrorism," 66 Fed. Reg. 49079
        (Sept. 24 2001). (U)

    Ex.2    (U) U.S. Department of the Treasury website, Press Release,          0036-0044
        "Treasury Targets Key Hizballah Financing Network and
        Iranian Conduit," May 17, 2018, available at
        https://www.treasury.gov/news/press-releases/sm0388. (U)

    Ex.3    (U) ███████████████████████             0045-0048
        ██████████████████████ (U)

    Ex.4    (U) Department of State, Office of the Coordinator for          0049-0051
        Counterterrorism, "Designation of Terrorists and Terrorist
        Organizations Pursuant to Executive Order 13224 of
        September 23, 2001," 67 Fed. Reg. 12633 (Mar. 19, 2002). (U)

    Ex.5    (U) Department of State website, Bureau of Counterterrorism,          0052-0058
        Foreign Terrorist Organizations,
        https://www.state.gov/j/ct/rls/other/des/123085.htm,
        accessed Mar. 8, 2018. (U)

    Ex.6    (U) Executive Order 12947 of January 23, 1995, "Prohibiting          0059-0061
        Transactions With Terrorists Who Threaten To Disrupt the
        Middle East Peace Process," 60 Fed. Reg. 5079 (Jan. 25, 1995). (U)

SECRET

SECRET ████

Ex.7   (U) Department of the Treasury, Office of Foreign Assets Control,   0062-0063
       "Designation of One (1) Entity Pursuant to Executive
       Order 13582 of August 17, 2011," 77 Fed. Reg. 49864
       (Aug. 17, 2012). (U)

Ex.8   (U//~~FOUO~~) ████████████ (S████   0064-0067

Ex.9   (U//~~FOUO~~) ████████████ (S████   0068-0072

Ex.10  (U//~~FOUO~~) ████████████   0073-0076
       (S████████

Ex.11  (U//~~FOUO~~) ████████████   0077-0081
       (S████████

Ex.12  (U//~~FOUO~~) ████████████   0082-0086
       (S████████

Ex.13  (U//~~FOUO~~) ████████████   0087-0089
       (S████████



Ex.14   Non-Responsive   0090-0091

Ex.15   0092-0094

Ex.16   0095-0096

Ex.17   0097-0100

Ex.18   0101-0102

Ex.19   0103-0104

Ex.20   0105-0107

Ex.21  (U) The Registrar of Companies for England and Wales,   0108-0125
       Certificate of Incorporation of a Private Limited Company,
       Company Number 11207847, BSQRD Limited, February 15, 2018.
       (U)

SECRET



| | | |
|---|---|---|
| Ex.22 | Non-Responsive | 0126-0127 |
| Ex.23 | | 0128-0129 |
| Ex.24 | | 0130-0133 |
| Ex.25 | | 0134-0138 |
| Ex.26 | (U//LES) Biographic Information Request, CBP/NTC Wael Bazzi. (U//LES) | 0139 |
| Ex.27 | (U//FOUO) (S | 0140-0141 |
| Ex.28 | Non-Responsive | 0142 |
| Ex.29 | | 0143-0146 |
| Ex.30 | (U) Definition of Druze, www.merriam-webster.com /dictionary/Druze, accessed March 11, 2019. (U) | 0147-0148 |
| Ex.31 | (U) (U) | 0149-0150 |
| Ex.32 | (U) (U) | 0151-0154 |
| Ex.33 | (S (S | 0155-0156 |
| Ex.34 | (U) Definition of FIU, The Egmont Group of Financial Intelligence Units, www.fincen.gov. (U) | 0157-0162 |
| Ex.35 | (U//FOUO) (U//FOUO) | 0163-0170 |

SECRET

SECRET ███████

Ex.36  (U//FOUO) ███████████        0171-0175
       (S ████████

Ex.37  (U//FOUO) ███████████        0176-0181
       (TS ████████

Ex.38  (U) ██████████████           0182-0188
       ████████████████
       ████████████
       ████████████████ (U)

Ex.39  (U) ███████████████          0189-0200
       ████████████████████
       ██████████
       ███████████████
       ██████████ (U)

Ex.40  (U) ████████████             0201-0202
       ███████████████
       ██████████████
       █████████
       ██████ (U)



# NEWS

**Press Releases**

Statements & Remarks

Readouts

Testimonies

Featured Stories

Press Contacts

# PRESS RELEASES

## Treasury Targets Sanctions Evasion Conduits for Major Hizballah Financiers

April 24, 2019

**Washington** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) further targeted the global business operations of Hizballah by designating two individuals and three entities acting as conduits for sanctions evasion

SDGT-15665 0001

schemes. Specifically, OFAC designated Belgium-based Wael Bazzi for acting for or on behalf of his father and Hizballah financier, Mohammad Bazzi. OFAC designated Belgium-based Voltra Transcor Energy BVBA, Belgium-based OFFISCOOP NV, and United Kingdom-based BSQRD Limited for being owned or controlled by Wael Bazzi. OFAC is also adding Energy Engineers Procurement and Construction as an alias for Global Trading Group NV (GTG), one of Mohammad Bazzi's companies, which was designated in May 2018. Additionally, OFAC designated Lebanon-based Hassan Tabaja for acting for or on behalf of his brother and Hizballah member and financier, Adham Tabaja. These individuals and entities were designated under Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism.

"Treasury is relentlessly pursuing Hizballah's financial facilitators by dismantling two of Hizballah's most important financial networks. As Hizballah continues to attempt to obscure its activities by using seemingly legitimate businesses, we will continue to take action against the front persons who hide the movement of money, including the relatives of designated terrorists," said Sigal Mandelker, Treasury Under Secretary for Terrorism and Financial Intelligence. "By targeting Hassan Tabaja and Wael Bazzi and their European-based companies, this Administration is continuing to disrupt all avenues of financial support relied upon by Hizballah."

## DESIGNATIONS BUILD ON REWARDS FOR JUSTICE PROGRAM

Today's designation of Hassan Tabaja and Wael Bazzi and his companies builds on the State Department's April 22, 2019 announcement of a Rewards for Justice (RFJ) reward offer for information leading to the disruption of Hizballah's financial mechanisms. The program provides rewards for information that helps bring terrorists to justice, prevents international acts of terrorism against U.S. persons or property, leads to the identification or location of a key terrorist leader, or disrupts terrorist financing. OFAC is designating individuals and entities connected to two of the financiers highlighted in that announcement, Mohammad Bazzi and Adham

SDGT-15665 0002
9/4/2019

Tabaja. For more information about the reward offer or to submit information on Hizballah's financial networks, visit the Rewards for Justice website at www.rewardsforjustice.net or contact the Rewards for Justice office via the confidential e-mail at LH@rewardsforjustice.net.

Today's action also builds on the unprecedented number of designations taken in 2018 exposing Hizballah's terrorist support networks and pervasive use of seemingly legitimate businesses to launder money and foment regional conflict. Hizballah and its proxies continue to use deceptive practices to circumvent sanctions, such as the use of family members and others to gain access to the formal financial system both in Lebanon and beyond. As a standard practice, the regulated public should undertake know-your-customer due diligence to ensure awareness of the ultimate beneficiaries of transactions. In cases with known links to designated terrorists, enhanced due diligence should be applied to ensure that the underlying activity is not in violation of U.S. sanctions. The Treasury Department is determined to protect the integrity of the U.S., Lebanese, and international financial system to ensure that Hizballah cannot exploit them to further its political, financial, or operational agenda.

As a result of today's action, all property and interests in property of these persons, and of any entities that are owned, directly or indirectly, 50 percent or more by the designated persons, that are in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC. OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.

Additionally, the two individuals and three entities designated today are subject to secondary sanctions pursuant to the Hizballah Financial Sanctions Regulations, which implements the Hizballah International Financing Prevention Act of 2015. Pursuant to this authority, OFAC can prohibit or impose strict conditions on the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that knowingly facilitates a significant transaction for Hizballah, or a person acting on behalf of or at the direction of, or owned or controlled by, Hizballah.

Hizballah was designated by the Department of State as a Foreign Terrorist Organization in October 1997 and as a Specially Designated Global Terrorist (SDGT) pursuant to E.O. 13224 in October 2001. It was listed in January 1995 in the Annex to E.O. 12947, which targets terrorists who threaten to disrupt the Middle East peace process, and also designated in August 2012 pursuant to E.O. 13582, which targets the Government of Syria and its supporters.

## BACKGROUND ON ADHAM TABAJA AND MOHAMMAD BAZZI

OFAC designated Adham Tabaja as an SDGT in June 2015 for providing support and services to Hizballah. Adham Tabaja is a Hizballah member and majority owner of the designated Lebanon-based real estate development and construction firm Al-Inmaa Group for Tourism Works and its subsidiaries. His company has been used by Hizballah as an investment mechanism. He maintains direct ties to senior Hizballah organizational elements, including the terrorist group's operational component, the Islamic Jihad, the unit responsible for carrying out the group's overseas terrorist activities. Specifically, Islamic Jihad member Husayn Ali Faour, whom OFAC designated concurrently with Adham Tabaja in June 2015, has worked with Adham Tabaja to secure and manage construction, oil, and other projects in Iraq. Adham Tabaja's global network of seemingly legitimate businesses combined with his ties to Hizballah's terrorist unit make it critically important that his access to the international financial system is severed to ensure that he cannot fund this terrorist group.

Adham Tabaja maintains ties to other major Hizballah financiers, including Mohammad Bazzi, whom OFAC designated as an SDGT in May 2018 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah. Mohammad Bazzi, who operates or transacts in or through Belgium, Lebanon, Iraq, and several countries in West Africa, provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities. In addition, Mohammad Bazzi was a close associate of Yahya Jammeh who was identified on December 20,

SDGT-15665 0004
9/4/2019

2017, in the annex to E.O. 13818, which implemented the Global Magnitsky Human Rights Accountability Act. Since his designation in May 2018, Mohammad Bazzi has continued to work with other Treasury-designated, senior Hizballah members.

# WAEL BAZZI

Wael Bazzi was designated for acting for or on behalf of Mohammad Bazzi.

Since his designation in May 2018, Mohammad Bazzi has turned to his son, Wael Bazzi, to continue doing business in the Gambia. Mohammad Bazzi has been able to conduct business through Wael Bazzi, upon whom he has continued to rely on to register new businesses and bid on Gambian government contracts. Wael Bazzi formed a petroleum company to maintain his father's access to the oil industry. Additionally, Mohammad Bazzi coordinated with Wael Bazzi and a Belgium-based GTG employee to change GTG's name after GTG's designation. Wael Bazzi was the purported owner of this new company, likely to obscure Mohammad Bazzi's involvement and circumvent Mohammad Bazzi's designation.

Wael Bazzi has helped Mohammad Bazzi and a Lebanon-based associate facilitate payments for a business contract. Additionally, Wael Bazzi likely established an account for Voltra Transcor Energy, in connection with Mohammad Bazzi's attempted use of an intermediary company to move money to GTG and circumvent OFAC sanctions. In 2017, Mohammad Bazzi planned to submit his son, Wael Bazzi, to fill the Lebanese Consular position in the Gambia because he could exert his influence over Wael. As of at least early 2018, Wael Bazzi has been witting of Mohammad Bazzi's involvement in illicit activity.

On August 9, 2018, GTG changed its name to Energy Engineers Procurement and Construction.

# DESIGNATED WAEL BAZZI-OWNED OR -CONTROLLED COMPANIES

## Voltra Transcor Energy BVBA

Voltra Transcor Energy BVBA was designated for being owned or controlled by Wael Bazzi.

Wael Bazzi is the Chief Executive of Belgium-based Voltra Transcor Energy BVBA, which is involved in the petroleum products industry. Wael Bazzi established an account for Voltra Transcor Energy, which Mohammad Bazzi attempted to use as an intermediary company to move money to GTG and circumvent OFAC sanctions.

## OFFISCOOP NV

OFFISCOOP NV was designated for being owned or controlled by Wael Bazzi.

Wael Bazzi is the Chief Executive, Managing Director, and Director of Belgium-based OFFISCOOP NV, which is involved in the management consulting services industry.

## BSQRD Limited

BSQRD Limited was designated for being owned or controlled by Wael Bazzi.

Wael Bazzi is the Chief Executive, Director, and 50% owner of United Kingdom-based BSQRD Limited, which is involved in the computer-related services industry.

## HASSAN TABAJA

Hassan Tabaja was designated for acting for or on behalf of Adham Tabaja.

Hassan Tabaja managed multiple properties in the United Arab Emirates (UAE) belonging to his brother, Adham Tabaja; however, in the summer of 2018 Emirati authorities took swift action against Hassan Tabaja and the assets he controlled as a result of his nefarious activities. Hassan Tabaja is the legal representative for Adham Tabaja, has Power of Attorney (PoA) for him, and is named the executor of his property. Accordingly, Hassan Tabaja was granted the power to make legal, real estate, and financial decisions; sign for business matters; buy and sell vehicles; take out loans; take out insurance policies; and cancel the PoA and any agreements in conjunction with and on behalf of Adham Tabaja.

SDGT-15665 0006
9/4/2019

Hassan Tabaja, likely on behalf of Adham Tabaja, has also pursued business transactions with Mohamad Noureddine, a Lebanese money launderer, whom OFAC designated as a SDGT pursuant to E.O. 13224 in January 2016, for providing financial services to or in support of, Hizballah.

View identifying information on the individuals and entities designated today.

####

## LATEST NEWS

September 4, 2019

Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies

September 3, 2019

Readout from a Treasury Spokesperson of Secretary Mnuchin's Meeting with French Finance Minister Bruno Le Maire

August 30, 2019

Treasury Targets Oil Tanker Adrian Darya 1 and its Captain

Preliminary Annual Report on U.S. Holdings of Foreign Securities

Treasury Announces Action on Tax Protocols with Two Key Trading Partners

## BUREAUS

Alcohol and Tobacco Tax and Trade (TTB)

SDGT-15665 0007

9/4/2019

Bureau of Engraving and Printing (BEP)

Bureau of the Fiscal Service (BFS)

Financial Crimes Enforcement Network (FinCEN)

Internal Revenue Service (IRS)

Office of the Comptroller of the Currency (OCC)

U.S. Mint

## INSPECTOR GENERAL SITES

Office of Inspector General (OIG)

Treasury Inspector General for Tax Administration (TIGTA)

Special Inspector General, Troubled Asset Relief Program (SIGTARP)

Report Scams, Fraud, Waste & Abuse

## U.S. GOVERNMENT SHARED

Enterprise Business Solutions

Administrative Resource Center (ARC)- Bureau of the Fiscal Service

Treasury Direct Services for Governments

## ADDITIONAL RESOURCES

Privacy Act

Small Business Contacts

Budget and Performance

TreasuryDirect.gov Securities/Bonds

Freedom of Information Act (FOIA)

No FEAR Act Data

Whistleblower Protection

SDGT-15665 0008
9/4/2019



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

OFFICE OF FOREIGN ASSETS CONTROL

Case ID SDGT-15586, SDGT-13168, SDGT-15665

<u>DESIGNATION AND BLOCKING MEMORANDUM</u>

Pursuant to Executive Order 13224 of September 23, 2001 (*"Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"*) ("the Order"), section 203 of the International Emergency Economic Powers Act, 50 U.S.C. § 1702, section 5 of the United Nations Participation Act of 1945, 22 U.S.C. § 287c, the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 301 of title 3, United States Code, and section 594.802 of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594, I hereby determine, after consultation with the Secretary of State and the Attorney General, that there is reason to believe the 2 individuals and 3 entities identified below and in the attached evidentiary memoranda (SDGT-15586, SDGT-13168, SDGT-15665), meet one or more criteria for designation set forth in the Order. Therefore, the persons listed below are designated pursuant to the Order and will now appear on the Office of Foreign Assets Control's (OFAC) list of Specially Designated Nationals and Blocked Persons.

**Individuals**

1. TABAJA, Hassan (a.k.a. TABAJA, Hasan; a.k.a. TABAJA, Hasan Husayn; a.k.a. TABAJA, Hassan Hussain), Lebanon; DOB ███ 1971; POB Chiah, Lebanon; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; Gender Male; Passport RL 0913767 (Lebanon); Identification Number 371923 (Lebanon); Residency Number 62270869 (United Arab Emirates) (individual) [SDGT] (Linked To: TABAJA, Adham Husayn).

2. BAZZI, Wael (a.k.a. BAZZI, Wa'el; a.k.a. BAZZI, Wa'il Muhammad, Eglantierlaan 15, Antwerpen 2020, Belgium; DOB ███ 1989 to ███ 1989; alt. DOB ███ 1989; POB Freetown, Sierra Leone; nationality Belgium; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; Gender Male; Passport EN312261 (Belgium); National ID No. 89103150321 (individual) [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

**Entities**

1. BSQRD LIMITED, Mansion House Manchester Road, Altrincham Chesire WA14 4RW, United Kingdom; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 22-369-

1

SDGT-15665 0009

SDGT-15665 0010

0096; Company Number 11207847 (United Kingdom) [SDGT] (Linked To: BAZZI, Wael).

2.   OFFISCOOP NV, Frankrijklei 156, 5eVerd, Antwerpen 2000, Belgium; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-163-1008; Branch Unit Number 2093737727 (Belgium); Enterprise Number 0473365047 (Belgium) [SDGT] (Linked To: BAZZI, Wael).

3.   VOLTRA TRANSCOR ENERGY BVBA (a.k.a. VOLTRA TRANSCOR ENERGY; f.k.a. "SOFTLINE"), Frankrijklei 156 (5deV), Antwerpen 2000, Belgium; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-339-4675; V.A.T. Number BE044368047 (Belgium); Branch Unit Number 2052342727 (Belgium); Enterprise Number 044368047 (Belgium) [SDGT] (Linked To: BAZZI, Wael).

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by OFAC, (1) all real, personal, and any other property and interests in property of the individuals and entities named above that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any U.S. person, including any foreign branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the individuals and entities named above is prohibited.

Additionally, except to the extent otherwise provided by law or unless licensed or otherwise authorized by OFAC, the following are prohibited: (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in the Order; and (2) any conspiracy formed to violate any of the prohibitions in the Order.

Additionally, OFAC is updating the listing on the Specially Designated Nationals and Blocked Persons List of one entity that was previously designated pursuant to Executive Order 13224. The entity's listing will be updated from:

**Entity**

1.   GLOBAL TRADING GROUP NV (a.k.a. GLOBAL TRADING GROUP), Frankrijklei 39, 2nd Floor, Antwerpen 2000, Belgium; 22 Liverpool Street, Freetown, Sierra Leone; Standard Chartered Bank Building, 2nd floor, Kairaba Ave, Banjul, The Gambia; Rue de Canal, G83 Zone 4G, 01BP1280, Abidjan, Cote d Ivoire; Quartier les Cocotiers, Avenue Pape Jean Paul II, Lot 4274, Cotonou, Benin; website www.globaltradinggroup.com; Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-117-1419 [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

-to-

2

SDGT-15665 0011

1. ENERGY ENGINEERS PROCUREMENT AND CONSTRUCTION (a.k.a. GLOBAL TRADING GROUP; a.k.a. GLOBAL TRADING GROUP NV; a.k.a. "EEPC"), Frankrijklei 39, 2nd Floor, Antwerpen 2000, Belgium; 22 Liverpool Street, Freetown, Sierra Leone; Standard Chartered Bank Building, 2nd floor, Kairaba Ave, Banjul, The Gambia; Rue de Canal, G83 Zone 4G, 01BP1280, Abidjan, Cote d Ivoire; Quartier les Cocotiers, Avenue Pape Jean Paul II, Lot 4274, Cotonou, Benin; Frankrijklei 156 (5th floor), Antwerpen 2000, Belgium; Website www.globaltradinggroup.com; Additional Sanctions Information - Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-117-1419 [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

The President determined in section 10 of the Order that, because of the ability to transfer funds or assets instantaneously, prior notice to persons designated pursuant to the Order who might have a constitutional presence in the United States of measures to be taken pursuant to the Order would render these measures ineffectual. Therefore, the President determined that there need be no prior notice of such a determination. In making these determinations pursuant to the Order, I also find that no prior notice should be afforded to the individuals or entities named above because to do so would provide an opportunity to evade the measures authorized by the Order and, consequently, would render those measures ineffectual.

April 24, 2019
Date

Andrea Gacki
Director
Office of Foreign Assets Control
U.S. Department of the Treasury

3

SDGT-15665 0012



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case ID SDGT-15586, SDGT-13168, SDGT-15665

OFFICE OF FOREIGN ASSETS CONTROL

## DESIGNATION AND BLOCKING MEMORANDUM

Pursuant to Executive Order 13224 of September 23, 2001 (*"Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism"*) ("the Order"), section 203 of the International Emergency Economic Powers Act, 50 U.S.C. § 1702, section 5 of the United Nations Participation Act of 1945, 22 U.S.C. § 287c, the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 301 of title 3, United States Code, and section 594.802 of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594, I hereby determine, after consultation with the Secretary of State and the Attorney General, that there is reason to believe the 2 individuals and 3 entities identified below and in the attached evidentiary memoranda (SDGT-15586, SDGT-13168, SDGT-15665), meet one or more criteria for designation set forth in the Order. Therefore, the persons listed below are designated pursuant to the Order and will now appear on the Office of Foreign Assets Control's (OFAC) list of Specially Designated Nationals and Blocked Persons.

**Individuals**

1. TABAJA, Hassan (a.k.a. TABAJA, Hasan; a.k.a. TABAJA, Hassan Husayn; a.k.a. TABAJA, Hassan Hussain), Lebanon; DOB ████ 1971; POB Chiah, Lebanon; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; Gender Male; Passport RL 0913767 (Lebanon); Identification Number 371923 (Lebanon); Residency Number 62270869 (United Arab Emirates) (individual) [SDGT] (Linked To: TABAJA, Adham Husayn).

2. BAZZI, Wael (a.k.a. BAZZI, Wa'el; a.k.a. BAZZI, Wa'il Muhammad), Eglantierlaan 15, Antwerpen 2020, Belgium; DOB ████ 1989 to ████ 1989; alt. DOB ████ 1989; POB Freetown, Sierra Leone; nationality Belgium; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; Gender Male; Passport EN312261 (Belgium); National ID No. 8910315321 (individual) [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

**Entities**

1. BSORD LIMITED, Mansion House Manchester Road, Altrincham Cheshire WA14 4RW, United Kingdom; Additional Sanctions Information – Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number

22-369-0096; Company Number 11207847 (United Kingdom) [SDGT] (Linked To: BAZZI, Wael).

2.  OFFISCOOP NV, Frankrijklei 156, 5eVerd, Antwerpen 2000, Belgium; Additional Sanctions Information - Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-163-1008; Branch Unit Number 2093737727 (Belgium); Enterprise Number 047365047 (Belgium) [SDGT] (Linked To: BAZZI, Wael).

3.  VOLTRA TRANSCOR ENERGY BVBA (a.k.a. VOLTRA TRANSCOR ENERGY; f.k.a. "SOFTLINE"), Frankrijklei 156 (5deV), Antwerpen 2000, Belgium; Additional Sanctions Information - Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-339-4675; V.A.T. Number BE0443680473 (Belgium); Branch Unit Number 2052342727 (Belgium); Enterprise Number 0443680473 (Belgium) [SDGT] (Linked To: BAZZI, Wael).

Accordingly, except to the extent otherwise provided by law or unless licensed or otherwise authorized by OFAC, (1) all real, personal, and any other property and interests in property of the individuals and entities named above that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any U.S. person, including any foreign branches, are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in, and (2) any transaction or dealing by a U.S. person or within the United States in property or interests in property of the individuals and entities named above is prohibited.

Additionally, except to the extent otherwise provided by law or unless licensed or otherwise authorized by OFAC, the following are prohibited: (1) any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in the Order; and (2) any conspiracy formed to violate any of the prohibitions in the Order.

Additionally, OFAC is updating the listing on the Specially Designated Nationals and Blocked Persons List of one entity that was previously designated pursuant to Executive Order 13224. The entity's listing will be updated from:

Entity

1.  GLOBAL TRADING GROUP NV (a.k.a. GLOBAL TRADING GROUP), Frankrijklei 39, 2nd Floor, Antwerp 2000, Belgium; 22 Liverpool Street, Freetown, Sierra Leone; Standard Chartered Bank Building, 2nd floor, Kairaba Ave, Banjul, The Gambia; Rue de Canal, G83 Zone 4G, 01BP1280, Abidjan, Cote d'Ivoire; Quartier les Cocotiers, Avenue Pape Jean Paul II, Lot 4274, Cotonou, Benin; website www.globaltradinggroup.com; Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-117-1419 [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

-o-

2

SDGT-15665 0013

SDGT-15665 0014

2.   ENERGY ENGINEERS PROCUREMENT AND CONSTRUCTION (a.k.a. GLOBAL TRADING GROUP; a.k.a. GLOBAL TRADING GROUP NV; a.k.a. "EEPC"), Frankrijklei 39, 2nd Floor, Antwerpen 2000, Belgium; 22 Liverpool Street, Freetown, Sierra Leone; Standard Chartered Bank Building, 2nd floor, Kairaba Ave, Banjul, The Gambia; Rue de Canal, G83 Zone 4G, 01BP1280, Abidjan, Cote d Ivoire; Quartier les Cocotiers, Avenue Pape Jean Paul II, Lot 4274, Cotonou, Benin; Frankrijklei 156 (5th floor), Antwerpen 2000, Belgium; Website www.globaltradinggroup.com; Additional Sanctions Information - Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D-U-N-S Number 37-117-1419 [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

The President determined in section 10 of the Order that, because of the ability to transfer funds or assets instantaneously, prior notice to persons designated pursuant to the Order who might have a constitutional presence in the United States of measures to be taken pursuant to the Order would render these measures ineffectual. Therefore, the President determined that there need be no prior notice of such a determination. In making these determinations pursuant to the Order, I also find that no prior notice should be afforded to the individuals or entities named above because to do so would provide an opportunity to evade the measures authorized by the Order and, consequently, would render those measures ineffectual.

May 3, 2019
_____
Date

_____
Andrea Gacki
Director
Office of Foreign Assets Control
U.S. Department of the Treasury

3


By the Board, Allison C. Davis, Acting Director, Office of Proceedings.

**Brendetta Jones,**
*Clearance Clerk.*

[FR Doc. 2019–10144 Filed 5–15–19; 8:45 am]

**BILLING CODE 4915–01–P**

## SURFACE TRANSPORTATION BOARD

[Docket No. FD 36267]

### Grand Trunk Western Railroad Company—Trackage Rights Exemption—Norfolk Southern Railway Company and Grand Elk Railroad LLC

Grand Trunk Western Railroad Company (GTW) has filed a verified notice of exemption under 49 CFR 1180.2(d)(7) to acquire trackage rights on a line of railroad in Kalamazoo, Mich., owned by Norfolk Southern Railway Company (NSR), and leased to Grand Elk Railroad LLC (GDLK).[1] GTW states that NSR and GDLK have agreed, pursuant to a written amendment to a trackage rights agreement, to grant GTW additional overhead trackage rights from milepost 2.17 at Miller Road southward to milepost 3.67 at Kilgore Road, a distance of approximately 1.50 miles.[2]

The verified notice states that the proposed transaction will afford GTW the ability to use the siding positioned between Miller Road and Kilgore Road to run around its railroad equipment to permit greater operating efficiency in its provision of common carrier service.

The transaction may be consummated on or after May 30, 2019, the effective date of the exemption (30 days after the verified notice of exemption was filed).

As a condition to this exemption, any employees affected by the trackage rights will be protected by the conditions imposed in *Norfolk & Western Railway—Trackage Rights— Burlington Northern, Inc.,* 354 I.C.C. 605 (1978), as modified in *Mendocino Coast Railway—Lease & Operate—California Western Railroad,* 360 I.C.C. 653 (1980).

If the verified notice contains false or misleading information, the exemption is void ab initio. Petitions to revoke the exemption under 49 U.S.C. 10502(d) may be filed at any time. The filing of a petition to revoke will not automatically stay the effectiveness of the exemption. Petitions for stay must be filed by May 23, 2019 (at least seven days before the exemption becomes effective).

All pleadings, referring to Docket No. FD 36267, must be filed with the Surface Transportation Board, either via e-filing or in writing addressed to 395 E Street SW, Washington, DC 20423–0001. In addition, a copy of each pleading must be served on GTW's representative, Bradon J. Smith, Fletcher & Sippel LLC, 29 North Wacker Drive, Suite 800, Chicago, IL 60606–3208.

According to GTW, this action is categorically excluded from environmental review under 49 CFR 1105.6(c), and from historic reporting under 49 CFR 1105.8(b)(3).

Board decisions and notices are available at *www.stb.gov.*

Decided: May 13, 2019.

By the Board, Allison C. Davis, Acting Director, Office of Proceedings.

**Jeffrey Herzig,**
*Clearance Clerk.*

[FR Doc. 2019–10155 Filed 5–15–19; 8:45 am]

**BILLING CODE 4915–01–P**

## DEPARTMENT OF THE TREASURY

### Office of Foreign Assets Control

### Notice of OFAC Sanctions Actions

**AGENCY:** Office of Foreign Assets Control, Treasury.

**ACTION:** Notice.

**SUMMARY:** The Department of the Treasury's Office of Foreign Assets Control (OFAC) is publishing the names of five persons that have been placed on OFAC's Specially Designated Nationals and Blocked Persons List based on OFAC's determination that one or more applicable legal criteria were satisfied. All property and interests in property subject to U.S. jurisdiction of these persons are blocked, and U.S. persons are generally prohibited from engaging in transactions with them. Additionally, OFAC is publishing an update to the identifying information of an entity currently on the Specially Designated Nationals and Blocked Persons List.

**DATES:** See **SUPPLEMENTARY INFORMATION** section.

**FOR FURTHER INFORMATION CONTACT:**
*OFAC:* Associate Director for Global Targeting, tel.: 202–622–2420; Assistant Director for Sanctions Compliance & Evaluation, tel.: 202–622–2490; Assistant Director for Licensing, tel.: 202–622–2480; Assistant Director for Regulatory Affairs, tel.: 202–622–4855; or the Department of the Treasury's Office of the General Counsel: Office of the Chief Counsel (Foreign Assets Control), tel.: 202–622–2410.

**SUPPLEMENTARY INFORMATION:**

### Electronic Availability

The Specially Designated Nationals and Blocked Persons List and additional information concerning OFAC sanctions programs are available on OFAC's website (*https://www.treasury.gov/ofac*).

### Notice of OFAC Action(s)

On April 24, 2019, OFAC determined that the property and interests in property subject to U.S. jurisdiction of the following five persons are blocked under the relevant sanctions authorities listed below.

### Individuals

1. TABAJA, Hassan (a.k.a. TABAJA, Hasan; a.k.a. TABAJA, Hasan Husayn; a.k.a. TABAJA, Hassan Hussain), Lebanon; DOB ▮▮▮ 1971; POB Chiah, Lebanon; Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; Gender Male; Passport RL 0913767 (Lebanon); Identification Number 371923 (Lebanon); Residency Number 62270869 (United Arab Emirates) (individual) [SDGT] (Linked To: TABAJA, Adham Husayn).

Designated pursuant to section 1(c) of Executive Order 13224 of September 23, 2001, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism" (E.O. 13224) for acting for or on behalf of TABAJA, Adham Husayn, an individual whose property and interests in property are blocked pursuant to E.O. 13224.

2. BAZZI, Wael (a.k.a. BAZZI, Wa'el; a.k.a. BAZZI, Wa'il Muhammad), Eglantierlaan 15, Antwerpen 2020, Belgium; DOB ▮▮▮ 1989 to ▮▮ 1989; alt. DOB ▮▮▮ 1989; POB Freetown, Sierra Leone; nationality Belgium; Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; Gender Male; Passport EN312261 (Belgium); National ID No. 89103150321 (individual) [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

Designated pursuant to section 1(c) of E.O.13224 for acting for or on behalf BAZZI, Mohammad Ibrahim, an individual whose property and interests in property are blocked pursuant to E.O. 13224.

### Entities

1. BSQRD LIMITED, Mansion House Manchester Road, Altrincham Cheshire WA14 4RW, United Kingdom; Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D–U–N–S Number 22–369–0096; Company Number 11207847 (United Kingdom) [SDGT] (Linked To: BAZZI, Wael).

Designated pursuant to section 1(c) of E.O. 13224 for being owned or controlled by BAZZI, Wael, an individual whose property and interests in property are blocked pursuant to E.O. 13224.

---

[1] GTW filed a supplement to its notice on May 9, 2019, to clarify the mileposts for the trackage rights to be acquired, and to submit a revised map.

[2] A redacted version of the agreement between GTW and NSR was filed with GTW's verified notice of exemption. GTW simultaneously filed a motion for a protective order to protect the confidential and commercially sensitive information in the unredacted version of the agreement, which GTW submitted under seal. That motion will be addressed in a separate decision.

SDGT-15665 0015

2. OFFISCOOP NV, Frankrijklei 156, 5eVerd, Antwerpen 2000, Belgium; Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D–U–N–S Number 37–163–1008; Branch Unit Number 2093373727 (Belgium); Enterprise Number 0473365047 (Belgium) [SDGT] (Linked To: BAZZI, Wael).

Designated pursuant to section 1(c) of E.O.13224 for being owned or controlled by BAZZI, Wael, an individual whose property and interests in property are blocked pursuant to E.O. 13224.

3. VOLTRA TRANSCOR ENERGY BVBA (a.k.a. VOLTRA TRANSCOR ENERGY; f.k.a. "SOFTLINE"), Frankrijklei 156 (5deV), Antwerpen 2000, Belgium; Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D–U–N–S Number 37–339–4675; V.A.T. Number BE0443680473 (Belgium); Branch Unit Number 2052342727 (Belgium); Enterprise Number 0443680473 (Belgium) [SDGT] (Linked To: BAZZI, Wael).

Designated pursuant to section 1(c) of E.O.13224 for being owned or controlled by BAZZI, Wael, an individual whose property and interests in property are blocked pursuant to E.O. 13224.

Additionally, on April 24, 2019, OFAC updated the listing on the Specially Designated Nationals and Blocked Persons List for the following entity, whose property and interests in property subject to U.S. jurisdiction continue to be blocked under the relevant sanctions authorities listed below.

**Entity**

1. GLOBAL TRADING GROUP NV (a.k.a. GLOBAL TRADING GROUP), Frankrijklei 39, 2nd Floor, Antwerpen 2000, Belgium; 22 Liverpool Street, Freetown, Sierra Leone; Standard Chartered Bank Building, 2nd floor, Kairaba Ave, Banjul, The Gambia; Rue de Canal, G83 Zone 4G, 01BP1280, Abidjan, Cote d Ivoire; Quartier les Cocotiers, Avenue Pape Jean Paul II, Lot 4274, Cotonou, Benin; website *www.globaltradinggroup.com;* Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D–U–N–S Number 37–117–1419 [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

Designated pursuant to section 1(c) of E.O. 13224 for being owned or controlled by BAZZI, Mohammad Ibrahim, an individual determined to be subject to E.O. 13224.

The listing for this previously designated entity now appears as follows:

1. ENERGY ENGINEERS PROCUREMENT AND CONSTRUCTION (a.k.a. GLOBAL TRADING GROUP; a.k.a. GLOBAL TRADING GROUP NV; a.k.a. "EEPC"), Frankrijklei 39, 2nd Floor, Antwerpen 2000, Belgium; 22 Liverpool Street, Freetown, Sierra Leone; Standard Chartered Bank Building, 2nd floor, Kairaba Ave, Banjul, The Gambia; Rue de Canal, G83 Zone 4G, 01BP1280, Abidjan, Cote d Ivoire; Quartier les Cocotiers, Avenue Pape Jean Paul II, Lot 4274, Cotonou, Benin; Frankrijklei 156 (5th floor), Antwerpen 2000, Belgium; website *www.globaltradinggroup.com;* Additional Sanctions Information—Subject to Secondary Sanctions Pursuant to the Hizballah Financial Sanctions Regulations; D–U–N–S Number 37–117–1419 [SDGT] (Linked To: BAZZI, Mohammad Ibrahim).

Designated pursuant to section 1(c) of E.O. 13224 for being owned or controlled by BAZZI, Mohammad Ibrahim, an individual whose property and interests in property are blocked pursuant to E.O. 13224.

Dated: April 24, 2019.

**Andrea Gacki,**

*Director, Office of Foreign Assets Control.*

[FR Doc. 2019–10134 Filed 5–15–19; 8:45 am]

**BILLING CODE 4810–AL–P**



TOP SECRET



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

OFFICE OF FOREIGN ASSETS CONTROL

SDGT-15665

# EVIDENTIARY MEMORANDUM

(U) MEMORANDUM FOR:   ANDREA GACKI
DIRECTOR
OFFICE OF FOREIGN ASSETS CONTROL

(U) THROUGH:   GREGORY GATJANIS
ASSOCIATE DIRECTOR
OFFICE OF GLOBAL TARGETING

TODD CONKLIN
DEPUTY ASSOCIATE DIRECTOR
OFFICE OF GLOBAL TARGETING

NIKOLE THOMAS
ASSISTANT DIRECTOR
COUNTERTERRORISM, HUMAN RIGHTS AND
CORRUPTION

SECTION CHIEF
COUNTERTERRORISM SECTION

(U) FROM:

SANCTIONS INVESTIGATOR
COUNTERTERRORISM SECTION

(U) SUBJECT:   **WAEL BAZZI** Non-Responsive Additional
Designations Pursuant to Executive Order 13224 of September
23, 2001

1



TOP SECRET

████ TOP SECRET ████

## (U) I. **INTRODUCTION**

(U) On September 23, 2001, the President issued Executive Order 13224, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism" ("E.O. 13224" or the "Order"). [Exhibit 1]

(U) The Order, as amended, blocks the property and interests in property of any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, the Secretary of Homeland Security, and the Attorney General, to meet one or more of the criteria in the Order. [Exhibit 1]

(S████ Information presented in this memorandum and the accompanying exhibits provides reason to believe that:

- (S████ **WAEL BAZZI**[1] acts for or on behalf of MOHAMMAD IBRAHIM BAZZI*,[2] a person whose property and interests in property are blocked pursuant to E.O. 13224.



(S████ Therefore, **WAEL BAZZI**████ Non-Responsive ████ should be added to the list of Specially Designated Nationals and Blocked Persons.

## (U) II. **IDENTIFYING INFORMATION**

1. (U) **WAEL BAZZI** (**Individual**) [Exhibit 21, p. 3]
   - (S████ A.K.A.: Wa'el Bazzi [Exhibit 9, p. 3]
   - (S████ A.K.A.: Wa'il Muhammad Bazzi [Exhibit 10, p. 2]
   - (U)   D.O.B.: ████ 1989 [Exhibit 21, p. 3]
   - (U)   Alt. D.O.B. ████, 1989 [Exhibit 26, p. 1]

---

[1] (U) The names of proposed targets will appear in **BOLD CAPITAL** letters. Throughout this memorandum, an asterisk (*) following a name in All CAPS denotes an individual or entity whose property and interests in property have been blocked.

[2] (U) On May 17, 2018, OFAC designated MOHAMMAD IBRAHIM BAZZI* pursuant to E.O. 13224 for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, HIZBALLAH*. [Exhibit 2, p. 3]

████ TOP SECRET ████

SDGT-15665 0018

TOP SECRET ███████████

(S)███ P.O.B.: Freetown, Sierra Leone [Exhibit 33, p. 1]
(S)███ Eglantierlaan 15, Antwerp, Antwerpen 2020, Belgium [Exhibit 33, p. 1]
(S)███ Gender: Male [Exhibit 33, p. 1]
(U)     Nationality: Belgian [Exhibit 21, p. 3]
(U) Passport Number: EN312261 (Belgium) [Exhibit 26, p. 1]
(S)███ National ID Number: 89103150321 [Exhibit 33, p. 1]



Non-Responsive

## (U) III. BASIS FOR DETERMINATION

### 1.  (U) **WAEL BAZZI (Individual) (WAEL)**

(S)███ *WAEL BAZZI acts for or on behalf of MOHAMMAD IBRAHIM BAZZI\*, a person whose property and interests in property are blocked pursuant to E.O. 13224.*



Non-Responsive

[Exhibit 36, p. 1]

TOP SECRET ███████████

SDGT-15665 0019

TOP SECRET



[Exhibit 36, pp. 1–2]

[Exhibit 8, p. 2]

[Exhibit 9, p. 3]

---

[5] (U) On May 17, 2018, OFAC designated GLOBAL TRADING GROUP NV* pursuant to E.O. 13224 for being owned or controlled by MOHAMMAD IBRAHIM BAZZI*. [Exhibit 2, p. 3]

[6] (S) [Exhibit 36, p. 1]

[7] (U) [Exhibit 3, pp. 1, 4]

[8] (U) The Department of State designated HIZBALLAH* pursuant to E.O. 13224 on October 31, 2001, [Exhibit 4, pp. 1–2] and section 219 of the Immigration and Nationality Act, as amended, 8 U.S.C. § 1189, on October 8, 1997. [Exhibit 5, p. 1] HIZBALLAH* is also listed in the Annex to E.O. 12947 of January 23, 1995. [Exhibit 6, p. 3] OFAC designated HIZBALLAH* pursuant to E.O. 13582 on August 10, 2012. [Exhibit 7, p. 2]

[9] (S)

[10] (U) FIU is an acronym for Financial Intelligence Unit, according to Fincen.gov. [Exhibit 34, p. 3]

[11] (S) [Exhibit 10, p. 2]

4

TOP SECRET



TOP SECRET

[Exhibit 10, pp. 1–2]

[Exhibit 11, pp. 1–2]

[Exhibit 31, p. 2].

[Exhibit 32, p. 3]

[Exhibit 12, p. 4]

5

TOP SECRET

TOP SECRET



[Exhibit 12, p. 2]

[Exhibit 27, pp. 1–2]

[Exhibit 13, p. 1]

---

[14] (S

[Exhibit 27, pp. 1-2]

[15] (U) According to Merriam-Webster, a Druze is a member of a religious sect originating among Muslims and centered in Lebanon and Syria.  [Exhibit 30, p. 2]

TOP SECRET

SDGT-15665 0022

TOP SECRET ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## (U) ADDITIONAL INFORMATION



[Exhibit 35, p. 4]



[Exhibit 37, pp. 2–3]

Non-Responsive



16 (U//FOUO) ▓▓▓▓▓▓▓▓▓▓

17 (TS ▓▓▓
[Exhibit 37, p. 2]

18 (U) ▓▓
[Exhibit 38, p. 4]

19 (U ▓▓▓
[Exhibit 39, p. 9]

20 (TS ▓▓▓▓
[Exhibit 37, pp. 2–3]

21 (U) ▓▓▓▓▓▓
Exhibit 40, p. 1]

7

TOP SECRET ▓▓▓▓▓▓▓▓▓▓▓

SDGT-15665 0023

TOP SECRET



Non-Responsive

8

TOP SECRET

TOP SECRET

Non-Responsive



9

SDGT-15665 0025

TOP SECRET

Non-Responsive

10

SDGT-15665 0026

~~TOP SECRET~~ █████████████

## LIST OF EXHIBITS

(U) Exhibit 1:   Executive Order 13224 of September 23, 2001, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism," 66 Fed. Reg. 49079 (Sept. 24, 2001) (U)

(U) Exhibit 2:   U.S. Department of the Treasury website, Press Release, "Treasury Targets Key Hizballah Financing Network and Iranian Conduit," May 17, 2018, available at https://www.treasury.gov/news/press-releases/sm0388. (U)

(U) Exhibit 3:   ████████████████████████████████████ (U)

(U) Exhibit 4:   Department of State, Office of the Coordinator for Counterterrorism, "Designation of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001," 67 Fed. Reg. 12633 (Mar. 19, 2002) (U)

(U) Exhibit 5:   Department of State website, Bureau of Counterterrorism, Foreign Terrorist Organizations, https://www.state.gov/j/ct/rls/other/des/123085.htm, accessed Mar. 8, 2018 (U)

(U) Exhibit 6:   Executive Order 12947 of January 23, 1995, "Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process," 60 Fed. Reg. 5079 (Jan. 25, 1995) (U)

(U) Exhibit 7:   Department of the Treasury, Office of Foreign Assets Control, "Designation of One (1) Entity Pursuant to Executive Order 13582 of August 17, 2011," 77 Fed. Reg. 49864 (Aug. 17, 2012) (U)

(U) Exhibit 8:

(U) Exhibit 9:

(U) Exhibit 10:

(U) Exhibit 11:

(U) Exhibit 12:

(U) Exhibit 13:



11

~~TOP SECRET~~ █████████████

SDGT-15665 0027



TOP SECRET

Non-Responsive

Exhibit 14:

Exhibit 15:

Exhibit 16:

Exhibit 17:

Exhibit 18:

Exhibit 19:

Exhibit 20:

(U) Exhibit 21:   The Registrar of Companies for England and Wales, Certificate of Incorporation of a private limited Company, company number 11207847, BSQRD Limited, February 15, 2018 (U)

Non-Responsive

Exhibit 22:

Exhibit 23:

Exhibit 24:

Exhibit 25:

(U) Exhibit 26:   Biographic Information Request, CBP/NTC           Wael Bazzi (U//LES)

(U) Exhibit 27:

Non-Responsive

Exhibit 28:

Exhibit 29:

TOP SECRET

SDGT-15665 0028

TOP SECRET ████████████████████

(U) Exhibit 30:  Definition of Druze, www.merriam-webster.com/dictionary/Druze, accessed March 11, 2019 (U)

(U) Exhibit 31:  ████████████████████████████

(U) Exhibit 32:  ████████████████████████ (U)

(S) Exhibit 33:  ████████████████████ (S)

(U) Exhibit 34:  Definition of FIU, The Egmont Group of Financial Intelligence Units, www.fincen.gov (U)

(U) Exhibit 35:  ████████ (U//FOUO) ████████

(U) Exhibit 36:  ████████████ (S) ████████

(U) Exhibit 37:  ████████████ (TS)

(U) Exhibit 38:  ████████████████████████ (U) ████

(U) Exhibit 39:  ████████████████████ (U) ████

(U) Exhibit 40:  ████████ (U) ████████████

13

TOP SECRET ████████████████

SDGT-15665 0029

Exhibit 1



Tuesday,
September 25, 2001

Part IV

# The President

Executive Order 13224—Blocking
Property and Prohibiting Transactions
With Persons Who Commit, Threaten To
Commit, or Support Terrorism
Notice of September 24, 2001—
Continuation of Emergency With Respect
to UNITA

SDGT-15665 0030

Exhibit 1
**49079**

Federal Register

Vol. 66, No. 186

Tuesday, September 25, 2001

# Presidential Documents

Title 3—

**The President**

Executive Order 13224 of September 23, 2001

## Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. 287c) (UNPA), and section 301 of title 3, United States Code, and in view of United Nations Security Council Resolution (UNSCR) 1214 of December 8, 1998, UNSCR 1267 of October 15, 1999, UNSCR 1333 of December 19, 2000, and the multilateral sanctions contained therein, and UNSCR 1363 of July 30, 2001, establishing a mechanism to monitor the implementation of UNSCR 1333,

I, GEORGE W. BUSH, President of the United States of America, find that grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001, acts recognized and condemned in UNSCR 1368 of September 12, 2001, and UNSCR 1269 of October 19, 1999, and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and in furtherance of my proclamation of September 14, 2001, Declaration of National Emergency by Reason of Certain Terrorist Attacks, hereby declare a national emergency to deal with that threat. I also find that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists. I also find that a need exists for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism.

I hereby order:

**Section 1.** Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:

(a) foreign persons listed in the Annex to this order;

(b) foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States;

(c) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order;

SDGT-15665 0031

(d) except as provided in section 5 of this order and after such consultation, if any, with foreign authorities as the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, deems appropriate in the exercise of his discretion, persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

(i) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or

(ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order.

Sec. 2. Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date:

(a) any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to this order or determined to be subject to this order;

(b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited; and

(c) any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 3. For purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, corporation, or other organization, group, or subgroup;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term "terrorism" means an activity that—

(i) involves a violent act or an act dangerous to human life, property, or infrastructure; and

(ii) appears to be intended—

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

Sec. 4. I hereby determine that the making of donations of the type specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this order would seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances, and hereby prohibit such donations as provided by section 1 of this order. Furthermore, I hereby determine that the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX, Public Law 106–387) shall not affect the imposition or the continuation of the imposition of any unilateral agricultural sanction or unilateral medical sanction on

SDGT-15665 0032

any person determined to be subject to this order because imminent involvement of the Armed Forces of the United States in hostilities is clearly indicated by the circumstances.

**Sec. 5.** With respect to those persons designated pursuant to subsection 1(d) of this order, the Secretary of the Treasury, in the exercise of his discretion and in consultation with the Secretary of State and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under IEEPA and UNPA if the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

**Sec. 6.** The Secretary of State, the Secretary of the Treasury, and other appropriate agencies shall make all relevant efforts to cooperate and coordinate with other countries, including through technical assistance, as well as bilateral and multilateral agreements and arrangements, to achieve the objectives of this order, including the prevention and suppression of acts of terrorism, the denial of financing and financial services to terrorists and terrorist organizations, and the sharing of intelligence about funding activities in support of terrorism.

**Sec. 7.** The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

**Sec. 8.** Nothing in this order is intended to affect the continued effectiveness of any rules, regulations, orders, licenses, or other forms of administrative action issued, taken, or continued in effect heretofore or hereafter under 31 C.F.R. chapter V, except as expressly terminated, modified, or suspended by or pursuant to this order.

**Sec. 9.** Nothing contained in this order is intended to create, nor does it create, any right, benefit, or privilege, substantive or procedural, enforceable at law by a party against the United States, its agencies, officers, employees or any other person.

**Sec. 10.** For those persons listed in the Annex to this order or determined to be subject to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

**Sec. 11.** (a) This order is effective at 12:01 a.m. eastern daylight time on September 24, 2001.

SDGT-15665 0033

Exhibit 1

**49082**   **Federal Register** / Vol. 66, No. 186 / Tuesday, September 25, 2001 / Presidential Documents

(b) This order shall be transmitted to the Congress and published in the **Federal Register**.

THE WHITE HOUSE,
*September 23, 2001.*

Billing code 3195–01–P

SDGT-15665 0034

Federal Register / Vol. 66, No. 186 / Tuesday, September 25, 2001 / Presidential Documents   Exhibit 1   49083

ANNEX

Al Qaida/Islamic Army

Abu Sayyaf Group

Armed Islamic Group (GIA)

Harakat ul-Mujahidin (HUM)

Al-Jihad (Egyptian Islamic Jihad)

Islamic Movement of Uzbekistan (IMU)

Asbat al-Ansar

Salafist Group for Call and Combat (GSPC)

Libyan Islamic Fighting Group

Al-Itihaad al-Islamiya (AIAI)

Islamic Army of Aden

Usama bin Laden

Muhammad Atif (aka, Subhi Abu Sitta,
    Abu Hafs Al Masri)

Sayf al-Adl

Shaykh Sai'id (aka, Mustafa Muhammad Ahmad)

Abu Hafs the Mauritanian (aka, Mahfouz Ould al-Walid, Khalid Al-
    Shanqiti)

Ibn Al-Shaykh al-Libi

Abu Zubaydah (aka, Zayn al-Abidin Muhammad Husayn, Tariq)

Abd al-Hadi al-Iraqi (aka, Abu Abdallah)

Ayman al-Zawahiri

Thirwat Salah Shihata

Tariq Anwar al-Sayyid Ahmad (aka, Fathi, Amr al-Fatih)

Muhammad Salah (aka, Nasr Fahmi Nasr Hasanayn)

Makhtab Al-Khidamat/Al Kifah

Wafa Humanitarian Organization

Al Rashid Trust

Mamoun Darkazanli Import-Export Company

[FR Doc. 01–24205

Filed 9–24–01; 1:05 pm]

Billing code 4810–25–C

SDGT-15665 0035

**EXHIBIT 2**

# NEWS

| **Press Releases**

    Statements & Remarks

    Readouts

    Testimonies

Featured Stories

Press Contacts

# PRESS RELEASES

## Treasury Targets Key Hizballah Financing Network and Iranian Conduit

May 17, 2018

*Action disrupts Hizballah's global business empire in Europe, Africa, and Middle East*

SDGT-15665 0036

# EXHIBIT 2

**Washington** – Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) designated Hizballah financier Mohammad Ibrahim Bazzi and Hizballah's representative to Iran Abdallah Safi-Al-Din as Specially Designated Global Terrorists (SDGTs) pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism. Also designated today as SDGTs are five companies located in Europe, West Africa, and the Middle East for being owned or controlled by Mohammad Bazzi and another SDGT. Specifically, OFAC designated Belgian energy services conglomerate, Global Trading Group NV; a Gambia-based petroleum and petroleum products company, Euro African Group LTD; and Lebanon-based Africa Middle East Investment Holding SAL, Premier Investment Group SAL Offshore; and Car Escort Services S.A.L. Off Shore (CES), an import/export company based in Lebanon. This is the third action in the past week in which OFAC has designated terrorists with a connection to the Central Bank of Iran.

"This action highlights the duplicity and disgraceful conduct of Hizballah and its Iranian backers. Despite Nasrallah's claims, Hizballah uses financiers like Bazzi who are tied to drug dealers, and who launder money to fund terrorism," said Secretary of the Treasury Steven T. Mnuchin. "The savage and depraved acts of one of Hizballah's most prominent financiers cannot be tolerated. This Administration will expose and disrupt Hizballah and Iranian terror networks at every turn, including those with ties to the Central Bank of Iran."

As a result of today's action, all property and interests in property of these persons that are in the United States or in the possession or control of U.S. persons must be blocked and reported to OFAC. OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons.

Today's actions show the convergence of Iran's support for terrorism with many facets of illicit criminal activity, including narcotics trafficking. In addition to providing millions of dollars to Hizballah, Mohammad Bazzi is a close associate of Yahya Jammeh, the corrupt former leader of The Gambia who, in addition to ordering targeted assassinations, plundered The Gambia's state coffers for his personal gain. In addition, Bazzi has business ties to the Ayman Joumaa Drug Trafficking and Money

SDGT-15665 0025

2

Laundering Organization. As Hizballah's chief benefactor, Iran is complicit in the despicable behavior of Bazzi. Specifically, Abdallah Safi-Al-Din, Hizballah's representative to Iran and cousin of Hasan Nasrallah, Hizballah's Secretary General, worked with Bazzi to reestablish a political relationship between The Gambia and Iran. Moreover, Bazzi and Safi-Al-Din previously worked with the Central Bank of Iran, which OFAC recently identified as being complicit in facilitating the IRGC-QF's access to hundreds of millions of dollars in U.S. currency, to expand banking access between Iran and Lebanon.

These designations by OFAC follow President Trump's decision last week to cease U.S. participation in the Joint Comprehensive Plan of Action, and to begin reimposing U.S. nuclear-related sanctions on the Iranian regime. They are in furtherance of the goal of addressing the totality of Iran's malign activities and regionally destabilizing behavior, including that of Hizballah. These designations complement the disruptive action Treasury took last week to shut down an extensive currency exchange network in Iran and the UAE that was transferring millions to Iran's IRGC-QF. This action is also in addition to two other actions taken this week targeting IRGC-QF and Hizballah financing, including an action against Iran's Central Bank Governor and an action taken with Terrorist Financing Targeting Center partners designating Hizballah's Shura Council and other leaders and financiers. Today's actions further restrict Hizballah's access to the U.S. financial system and the Iranian regime's network of regional proxy groups.

## MOHAMMAD IBRAHIM BAZZI

Mohammad Ibrahim Bazzi (Bazzi) was designated for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, Hizballah.

Bazzi, who operates or transacts in or through Belgium, Lebanon, Iraq, and several countries in West Africa, is a key Hizballah financier who has provided Hizballah financial assistance for many years and has provided millions of dollars to Hizballah generated from his business activities.

## EXHIBIT 2

Bazzi maintains ties to Hizballah financiers Adham Tabaja (Tabaja) and Ali Youssef Charara (Charara), whom OFAC designated as SDGTs for providing material support to Hizballah on June 10, 2015 and January 7, 2016, respectively. Between 2009 and 2010, Abdallah Safi-Al-Din, also designated today, and Bazzi worked with the Central Bank of Iran to expand banking access between Iran and Lebanon. Abdallah Safi-Al-Din was previously identified by Treasury's Financial Crimes Enforcement Network (FinCEN) as being involved in Iranian officials' access to former Lebanese Canadian Bank (LCB), which FinCEN identified on February 10, 2011 as a financial institution of primary money laundering concern under Section 311 of the USA PATRIOT Act for the bank's role in facilitating the money laundering activities of an international narcotics trafficking and money laundering network.

In addition to providing millions of dollars to Hizballah, Mohammad Bazzi is a close associate of Yahya Jammeh who was identified on December 20, 2017, in the annex to E.O. 13818, which implemented the Global Magnitsky Human Rights Accountability Act. Further, Bazzi has business ties to the Ayman Joumaa Drug Trafficking and Money Laundering Organization, which OFAC designated on January 26, 2011 pursuant to the Foreign Narcotics Kingpin Designation Act. Bazzi also worked to provide funds to Tabaja, with whom he held a joint line of credit.

## ABDALLAH SAFI-AL-DIN

Abdallah Safi-Al-Din (Safi Al-Din) was designated for acting for or on behalf of Hizballah. Safi Al-Din is Hizballah's representative to Iran and acts as a conduit between Iran and Hizballah. He has also has served as the interlocutor between Hizballah and Iran on financial issues. As of 2011, Safi-Al-Din and Bazzi worked together to resolve a dispute between Iran and The Gambia and reestablish a political relationship between the two countries. Safi-Al-Din is the cousin of Hizballah's Secretary General Hasan Nasrallah (Nasrallah), whom OFAC designated pursuant to E.O. 13224 on May 16, 2018, E.O. 13582 on September 13, 2012, and also pursuant to E.O. 12947 on January 23, 1995.

EXHIBIT 2

# DESIGNATED BAZZI-OWNED OR -CONTROLLED COMPANIES

## GLOBAL TRADING GROUP NV

Global Trading Group NV (GTG) was designated for being owned or controlled by Bazzi. Bazzi is one of the founders and a Managing Director of GTG, a global energy products and services company headquartered in Antwerp, Belgium that also has locations in Sierra Leone, The Gambia, Ivory Coast, and Benin. As of 2015, Bazzi, as an owner of GTG, had drafted two securities totaling approximately $1 million to operate and maintain two power plants in Lebanon.

## EURO AFRICAN GROUP LTD

Euro African Group LTD (EAGL) was designated for being owned or controlled by Bazzi. Bazzi is the Chief Executive Officer and Managing Director and majority shareholder of EAGL, a petroleum and petroleum products company located in Banjul, The Gambia. GTG, in collaboration with EAGL, claims to have been the exclusive importer of all fuel products into The Gambia since 2003.

## AFRICA MIDDLE EAST INVESTMENT HOLDING SAL

Africa Middle East Investment Holding SAL (AME Investment) was designated for being owned or controlled by Bazzi. Bazzi is the Chairman, Managing Director, and majority shareholder of AME Investment, a holding company located in Beirut, Lebanon.

## PREMIER INVESTMENT GROUP SAL OFFSHORE

Premier Investment Group SAL Offshore (PIG Offshore) was designated for being owned or controlled by Bazzi. Bazzi is the founder, Chairman, Managing Director, and majority shareholder of PIG Offshore, a financial services company in Beirut, Lebanon.

EXHIBIT 2

# CAR ESCORT SERVICES S.A.L. OFF SHORE

Car Escort Services S.A.L. Off Shore (CES), an import/export company based in Lebanon, was designated for being owned or controlled by Bazzi and Charara, who collectively own two-thirds of the company.

These five companies should not be viewed as an exhaustive list of companies owned or controlled by Bazzi, and the regulated community remains responsible for conducting necessary due diligence and maintaining compliance with OFAC's 50 percent rule.

Each of the two individuals and five entities designated today are subject to secondary sanctions pursuant to the Hizballah Financial Sanctions Regulations, which implements the Hizballah International Financing Prevention Act of 2015. Pursuant to this authority, OFAC can prohibit or impose strict conditions on the opening or maintaining in the United States of a correspondent account or a payable-through account by a foreign financial institution that knowingly facilitates a significant transaction for Hizballah, or a person acting on behalf of or at the direction of, or owned or controlled by, Hizballah.

Hizballah was designated by the Department of State as a Foreign Terrorist Organization in October 1997 and as an SDGT pursuant to E.O. 13224 in October 2001. It was listed in January 1995 in the Annex to E.O. 12947, which targets terrorists who threaten to disrupt the Middle East peace process, and also designated in August 2012 pursuant to E.O. 13582, which targets the Government of Syria and its supporters.

Today's action was conducted in coordination with several U.S. partners, including the U.S. Drug Enforcement Administration's Special Operations Division's Counter-Narcoterrorism Operations Center (CNTOC) and the U.S. Customs and Border Protection's National Targeting Center (NTC).

A network chart on the individuals and entities designated today    .

Identifying information on the individuals and entities designated today.

####

EXHIBIT 2

# LATEST NEWS

November 30, 2018

United States and Argentina Sign Energy Cooperation Framework

Joint Statement on the Establishment of the Canada-Mexico-United States Financial Regulatory Forum

Treasury Secretary Mnuchin Statement on the Signing of the USMCA

November 28, 2018

Treasury Issues Highly Anticipated Guidance on Foreign Tax Credits

U.S. and Jamaica Sign Energy Cooperation Framework

## BUREAUS

Alcohol and Tobacco Tax and Trade (TTB)

Bureau of Engraving and Printing (BEP)

Bureau of the Fiscal Service (BFS)

Financial Crimes Enforcement Network (FinCEN)

Internal Revenue Service (IRS)

Office of the Comptroller of the Currency (OCC)

U.S. Mint

## INSPECTOR GENERAL SITES

Office of Inspector General (OIG)

Treasury Inspector General for Tax Administration (TIGTA)

SDGT-15665 0047

7

12/3/2018

EXHIBIT 2

Special Inspector General, Troubled Asset Relief Program (SIGTARP)

Report Scams, Fraud, Waste & Abuse

## U.S. GOVERNMENT SHARED

Enterprise Business Solutions

Administrative Resource Center (ARC)- Bureau of the Fiscal Service

Treasury Direct Services for Governments

## ADDITIONAL RESOURCES

Privacy Act

Small Business Contacts

Budget and Performance

TreasuryDirect.gov Securities/Bonds

Freedom of Information Act (FOIA)

No FEAR Act Data

Whistleblower Protection

## OTHER GOVERNMENT SITES

USA.gov

USAJOBS.gov

OPM.gov

MyMoney.gov

Data.gov

Forms.gov

Regulations.gov

PaymentAccuracy.gov

my Social Security

SDGT-15665 0048

EXHIBIT 2

العربية | 中文 | ... añol | 한국어 | Tagalog | TiếngViệt

Privacy Policy • Legal Privacy • Site Map • Site Policies and Notices • FAQs • Feedback • Careers • Accessibility

Required Plug-ins Adobe Reader

SDGT-15665 00

Evidentiary Memorandum

Exhibit 3 Withheld in Full

Bates Numbers: SDGT-15665 0045-0048

## C. Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received From Members, Participants or Others

No written comments were solicited or received with respect to the proposed rule change.

## III. Date of Effectiveness of the Proposed Rule Change and Timing for Commission Action

Within 35 days of the date of publication of this notice in the **Federal Register** or within such longer period (i) as the Commission may designate up to 90 days of such date if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory organization consents, the Commission will:

A. By order approve such proposed rule change, or

B. Institute proceedings to determine whether the proposed rule change should be disapproved.

## IV. Solicitation of Comments

Interested persons are invited to submit written data, views, and arguments concerning the foregoing, including whether the proposed rule change, as amended, is consistent with the Act. Persons making written submissions should file six copies thereof with the Securities and Exchange Commission, 450 Fifth Street, NW., Washington, DC 20549–0609. Copies of the submission, all subsequent amendments, all written statements with respect to the proposed rule change that are filed with the Commission, and all written communications relating to the proposed rule change between the Commission and any person, other than those that may be withheld from the public in accordance with the provisions of 5 U.S.C. 552, will be available for inspection and copying in the Commission's Public Reference Room. Copies of such filing will also be available for inspection and copying at the principal office of the NASD. All submissions should refer to File No. SR–NASD–2001–97 and should be submitted by April 9, 2002.

For the Commission, by the Division of Market Regulation, pursuant to delegated authority.[9]

**Margaret H. McFarland,**

*Deputy Secretary.*

[FR Doc. 02–6510 Filed 3–18–02; 8:45 am]

**BILLING CODE 8010–01–P**

---

[9] 17 CFR 200.30–3(a)(12).

## DEPARTMENT OF STATE

### Office of the Coordinator for Counterterrorism

[Public Notice 3947]

### Designations of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001

**AGENCY:** Office of the Coordinator for Counterterrorism, State.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given of the designation by the Secretary of State of foreign persons whose property and interests in property have been blocked pursuant to Executive Order 13224 of September 23, 2001. These designations comprise 8 individuals and 29 organizations determined to meet the criteria set forth under subsection 1(b) of Executive Order 13224.

**DATES:** These determinations were made by the Secretary of State on October 12, 2001, October 31, 2001, December 18, 2001, and December 31, 2001, in consultation with the Secretary of the Treasury and Attorney General.

**FOR FURTHER INFORMATION CONTACT:** Frederick W. Axelgard, Office of the Coordinator for Counterterrorism, Department of State; telephone: (202) 647–9892; fax: (202) 647–0221.

**SUPPLEMENTARY INFORMATION:**

## Background

On September 23, 2001, President Bush issued Executive Order 13224 (the "Order") imposing economic sanctions on persons (defined as including individuals or entities) who, *inter alia*, commit, threaten to commit, or support certain acts of terrorism. In an annex to the Order, President Bush identified 12 individuals and 15 entities whose assets are blocked pursuant to the Order (66 FR 49079, September 25, 2001). The property and interests in property of an additional 33 individuals and 6 entities were blocked pursuant to determinations by the Secretary of State and the Secretary of the Treasury (effective October 12, 2001), referenced in a **Federal Register** Notice published by the Office of Foreign Assets Control, Department of the Treasury (66 FR 54404, October 26, 2001). Further determinations made by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, on November 7, 2001, and December 4, 2001, December 20, 2001, January 9, 2002, February 26, and March 11 are addressed in a separate notice published elsewhere in this issue of the **Federal Register**.

Pursuant to subsection 1(b) of the Order, the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, has determined to date that 8 foreign individuals and 29 foreign organizations have been determined to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States. The Secretary of State's determination that each of these individuals and organizations meets the criteria set forth under subsection 1(b) of the Order subjects each of these individuals and organizations to sanctions. 23 of the organizations determined on October 31, 2001 and December 18, 2001 to meet the criteria set forth under subsection 1(b) of the Order are also subject to sanctions imposed pursuant to their designation as a Foreign Terrorist Organization pursuant to section 219 of the Immigration and Nationality Act, as amended, 8 U.S.C. 1189.

Pursuant to the determination made by the Secretary of State under subsection 1(b) of the Order, all property and interests in property of any listed person that are in the United States, that come within the United States, or that come within the possession or control of United States persons, including their overseas branches, are blocked. All transactions or dealings by U.S. persons or within the United States in property or interests in property of any listed person are prohibited unless licensed by the Department of the Treasury's Office of Foreign Assets Control or exempted by statute.

The determinations of the Secretary of State were effective on October 12, 2001, October 31, 2001, December 18, 2001, and December 31, 2001.

In Section 10 of the Order, the President determined that because of the ability to transfer funds or assets instantaneously, prior notice to persons listed in the Annex to, or determined to be subject to, the Order who might have a constitutional presence in the United States, would render ineffectual the blocking and other measures authorized in the Order. The President therefore determined that for these measures to be effective in addressing the national emergency declared in the Order, no prior notification of a listing or determination pursuant to the Order need be provided to any person who might have a constitutional presence in the United States.

The property and interests of property of the following persons are blocked and may not be transferred, paid, exported,

EXHIBIT 4

**12634**   Federal Register / Vol. 67, No. 53 / Tuesday, March 19, 2002 / Notices

withdrawn or otherwise dealt in except as authorized by regulations, orders, directives, rulings, instructions, licenses or otherwise:

*Designations by the Secretary of State on October 12, 2001*

*ADBELKARIM HUSSEIN MOHAMMED AL-NASSER*
*AHMAD IBRAHIM AL-MUGHASSIL*
*ALI SAED BIN ALI EL-HOORIE*
*IBRAHIM SALIH MOHAMMED AL-YACOUB*
*ALI ATWA*
*HASAN IZZ-AL-DIN*
*IMAD FAYEZ MUGNIYAH*
*KHALID SHAIKH MOHAMMED*

*Designations by the Secretary of State on October 31, 2001*

ABU NIDAL ORGANIZATION
  a.k.a. ANO;
  a.k.a. BLACK SEPTEMBER
  a.k.a. FATAH REVOLUTIONARY COUNCIL
  a.k.a. ARAB REVOLUTIONARY COUNCIL
  a.k.a. ARAB REVOLUTIONARY BRIGADES
  a.k.a. REVOLUTIONARY ORGANIZATION OF SOCIALIST MUSLIMS
AUM SHINRIKYO
  a.k.a. A.I.C. COMPREHENSIVE RESEARCH INSTITUTE
  a.k.a. A.I.C. SOGO KENKYUSHO
  a.k.a. ALEPH
  a.k.a. AUM SUPREME TRUTH
BASQUE FATHERLAND AND LIBERTY
  a.k.a. ETA
  a.k.a. EUZKADI TA ASKATASUNA
GAMA'A AL-ISLAMIYYA
  a.k.a. GI
  a.k.a. ISLAMIC GROUP
  a.k.a. IG
  a.k.a. AL-GAMA'AT
  a.k.a. ISLAMIC GAMA'A
  a.k.a. EGYPTIAN AL-GAMA'AT AL-ISLAMIYYA
HAMAS
  a.k.a. ISLAMIC RESISTANCE MOVEMENT
  a.k.a. HARAKAT AL-MUQAWAMA AL-ISLAMIYA
  a.k.a. STUDENTS OF AYYASH
  a.k.a. STUDENT OF THE ENGINEER
  a.k.a. YAHYA AYYASH UNITS
  a.k.a. IZZ AL-DIN AL-QASSIM BRIGADES
  a.k.a. IZZ AL-DIN AL-QASSIM FORCES
  a.k.a. IZZ AL-DIN AL-QASSIM BATTALIONS
  a.k.a. IZZ AL-DIN AL QASSAM BRIGADES
  a.k.a. IZZ AL-DIN AL QASSAM FORCES
  a.k.a. IZZ AL-DIN AL QASSAM BATTALIONS

HIZBALLAH
  a.k.a. PARTY OF GOD
  a.k.a. ISLAMIC JIHAD
  a.k.a. ISLAMIC JIHAD ORGANIZATION
  a.k.a. REVOLUTIONARY JUSTICE ORGANIZATION
  a.k.a. ORGANIZATION OF THE OPPRESSED ON EARTH
  a.k.a. ISLAMIC JIHAD FOR THE LIBERATION OF PALESTINE
  a.k.a. ORGANIZATION OF RIGHT AGAINST WRONG
  a.k.a. ANSAR ALLAH
  a.k.a. FOLLOWERS OF THE PROPHET MUHAMMED
KAHANE CHAI
  a.k.a. COMMITTEE FOR THE SAFETY OF THE ROADS
  a.k.a. DIKUY BOGDIM
  a.k.a. DOV
  a.k.a. FOREFRONT OF THE IDEA
  a.k.a. JUDEA POLICE
  a.k.a. KACH
  a.k.a. KAHANE LIVES
  a.k.a. KFAR TAPUAH FUND
  a.k.a. KOACH
  a.k.a. REPRESSION OF TRAITORS
  a.k.a. STATE OF JUDEA
  a.k.a. SWORD OF DAVID
  a.k.a. THE JUDEAN LEGION
  a.k.a. THE JUDEAN VOICE
  a.k.a. THE QOMEMIYUT MOVEMENT
  a.k.a. THE WAY OF THE TORAH
  a.k.a. THE YESHIVA OF THE JEWISH IDEA
KURDISTAN WORKERS' PARTY
  a.k.a. HALU MESRU SAVUNMA KUVVETI (HSK)
  a.k.a. PARTIYA KARKERAN KURDISTAN
  a.k.a. PKK
  a.k.a. THE PEOPLE'S DEFENSE FORCE
LIBERATION TIGERS OF TAMIL EELAM
  a.k.a. LTTE
  a.k.a. TAMIL TIGERS
  a.k.a. ELLALAN FORCE
MUJAHEDIN-E KHALQ
  a.k.a. MUJAHEDIN-E KHALQ ORGANIZATION
  a.k.a. MEK
  a.k.a. MKO
  a.k.a. NLA
  a.k.a. ORGANIZATION OF THE PEOPLE'S HOLY WARRIORS OF IRAN
  a.k.a. PEOPLE'S MUJAHEDIN ORGANIZATION OF IRAN
  a.k.a. PMOI
  a.k.a. SAZEMAN-E MUJAHEDIN-E KHALQ-E IRAN
  a.k.a. THE NATIONAL LIBERATION ARMY OF IRAN
NATIONAL LIBERATION ARMY
  a.k.a. ELN
  a.k.a. EJERCITO DE LIBERACION

NACIONAL
PALESTINE ISLAMIC JIHAD—SHAQAQI FACTION
  a.k.a. ABU GHUNAYM SQUAD OF THE HIZBALLAH BAYT AL-MAQDIS
  a.k.a. AL-AWDAH BRIGADES
  a.k.a. AL-QUDS BRIGADES
  a.k.a. AL-QUDS SQUADS
  a.k.a. ISLAMIC JIHAD IN PALESTINE
  a.k.a. ISLAMIC JIHAD OF PALESTINE
  a.k.a. PALESTINIAN ISLAMIC JIHAD
  a.k.a. PIJ
  a.k.a. PIJ-SHALLAH FACTION
  a.k.a. PIJ-SHAQAQI FACTION
  a.k.a. SAYARA AL-QUDS
PALESTINE LIBERATION FRONT—ABU ABBAS FACTION
  a.k.a. PALESTINE LIBERATION FRONT
  a.k.a. PLF
  a.k.a. PLF-ABU ABBAS
POPULAR FRONT FOR THE LIBERATION OF PALESTINE—GENERAL COMMAND
  a.k.a. PFLP-GC
REAL IRA
  a.k.a. 32 COUNTY SOVEREIGNTY COMMITTEE
  a.k.a. 32 COUNTY SOVEREIGNTY MOVEMENT
  a.k.a. IRISH REPUBLICAN PRISONERS WELFARE ASSOCIATION
  a.k.a. REAL IRISH REPUBLICAN ARMY
  a.k.a. REAL OGLAIGH NA HEIREANN
  a.k.a. RIRA
REVOLUTIONARY ARMED FORCES OF COLOMBIA
  a.k.a. FARC
REVOLUTIONARY NUCLEI
  a.k.a. POPULAR REVOLUTIONARY STRUGGLE
  a.k.a. EPANASTATIKOS LAIKOS AGONAS
  a.k.a. REVOLUTIONARY POPULAR STRUGGLE
  a.k.a. REVOLUTIONARY PEOPLE'S STRUGGLE
  a.k.a. JUNE 78
  a.k.a. ORGANIZATION OF REVOLUTIONARY INTERNATIONALIST SOLIDARITY
  a.k.a. ELA
  a.k.a. REVOLUTIONARY CELLS
  a.k.a. LIBERATION STRUGGLE
REVOLUTIONARY ORGANIZATION 17 NOVEMBER
  a.k.a. 17 NOVEMBER
  a.k.a. EPANASTATIKI ORGANOSI 17 NOEMVRI
REVOLUTIONARY PEOPLE'S LIBERATION PARTY/FRONT
  a.k.a. DEVRIMCI HALK KURTULUS PARTISI-CEPHESI
  a.k.a. DHKP/C;

SDGT-15665 0050

EXHIBIT 4

a.k.a. DEVRIMCI SOL
a.k.a. REVOLUTIONARY LEFT
a.k.a. DEV SOL
a.k.a. DEV SOL SILAHLI DEVRIMCI BIRLIKLERI
a.k.a. DEV SOL SDB
a.k.a. DEV SOL ARMED REVOLUTIONARY UNITS
SHINING PATH
a.k.a. SENDERO LUMINOSO
a.k.a. SL
a.k.a. PARTIDO COMUNISTA DEL PERU EN EL SENDERO LUMINOSO DE JOSE CARLOS MARIATEGUI (COMMUNIST PARTY OF PERU ON THE SHINING PATH OF JOSE CARLOS MARIATEGUI)
a.k.a. PARTIDO COMUNISTA DEL PERU (COMMUNIST PARTY OF PERU)
a.k.a. PCP
a.k.a. SOCORRO POPULAR DEL PERU (PEOPLE'S AID OF PERU)
a.k.a. SPP
a.k.a. EJERCITO GUERRILLERO POPULAR (PEOPLE'S GUERRILLA ARMY)
a.k.a. EGP
a.k.a. EJERCITO POPULAR DE LIBERACION (PEOPLE'S LIBERATION ARMY)
a.k.a. EPL
UNITED SELF-DEFENSE FORCES OF COLOMBIA
a.k.a. AUC
a.k.a. AUTODEFENSAS UNIDAS DE COLOMBIA

*Designation by the Secretary of State on December 18, 2001*

LASHKAR-E-TAIBA
a.k.a. LASHKAR E-TAYYIBA
a.k.a. LASKAR E-TOIBA
a.k.a. ARMY OF THE RIGHTEOUS

*Designations by the Secretary of State on December 31, 2001*

CONTINUITY IRA (CIRA)
LOYALIST VOLUNTEER FORCE (LVF)
ORANGE VOLUNTEERS (OV)
RED HAND DEFENDERS (RHD)
ULSTER DEFENCE ASSOCIATION/ ULSTER FREEDOM FIGHTERS (UDA/UFF)
FIRST OF OCTOBER ANTIFASCIST RESISTANCE GROUP (GRAPO)

Dated: March 13, 2002.

**Francis X. Taylor,**
*Coordinator for Counterterrorism, Department of State.*

[FR Doc. 02–6577 Filed 3–14–02; 3:48 pm]
**BILLING CODE 4710-10-P**

## OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE

**Technical Corrections to the Harmonized Tariff Schedule of the United States**

**AGENCY:** Office of the United States Trade Representative.
**ACTION:** Notice.

**SUMMARY:** The United States Trade Representative (USTR) is making technical corrections to the Harmonized Tariff Schedule of the United States (HTS) as set forth in the annex to this notice, pursuant to authority delegated to the USTR in Presidential Proclamation 6969 of January 27, 1997 (62 FR 4415). These modifications correct several inadvertent errors and omissions in the Annex to Presidential Proclamation 7529 of March 5, 2002 (67 FR 10553) so that the intended tariff treatment is provided.
**EFFECTIVE DATE:** March 20, 2002.
**FOR FURTHER INFORMATION CONTACT:** Office of Industry, Office of the United States Trade Representative, 600 17th Street, NW, Room 501, Washington DC, 20508. Telephone (202) 395–5656.
**SUPPLEMENTARY INFORMATION:** On March 5, 2002, Proclamation 7529 established increases in duty and a tariff-rate quota (safeguard measures) pursuant to section 203 of the Trade Act of 1974 (19 U.S.C. 2253) on imports of certain steel products described in paragraph 7 of that proclamation. Effective with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m., EST, on March 20, 2002, Proclamation 7529 modifies the HTS so as to provide for such increased duties and a tariff-rate quota. The annex to this notice makes technical corrections to the HTS to remedy several technical errors and omissions introduced through the annex to Proclamation 7529, so that the intended tariff treatment is provided. In particular, the annex to this notice corrects (1) errors in the physical dimensions or chemical composition of certain products excluded from the application of the safeguard measures and (2) errors regarding the exclusion of products of certain developing country WTO Members from the safeguard measures.

Proclamation 6969 authorized the USTR to exercise the authority provided to the President under section 604 of the Trade Act of 1974 (19 U.S.C. 2483) to embody rectifications, technical or conforming changes, or similar modifications in the HTS. Under authority vested in the USTR by Proclamation 6969, the rectifications, technical and conforming changes, and

similar modifications set forth in the annex to this notice shall be embodied in the HTS with respect to goods entered, or withdrawn from warehouse for consumption, on or after March 20, 2002.

**Peter F. Allgeier,**
*Deputy United States Trade Representative.*

**Annex**

The Harmonized Tariff Schedule of the United States (HTS) is modified as set forth in this annex, effective with respect to articles entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m., EST, on March 20, 2002. The following provisions supersede matter now in the HTS:

(1) United States note 11(b) to subchapter III of chapter 99 of the HTS is modified as follows: (a) In subdivision (b)(xi), the expression "ASTM 345 method A" is deleted and "ASTM E45 method A" is inserted in lieu thereof; (b) in subdivision (b)(xii), the expression "Charpy-notch" is deleted and "Charpy V-notch" is inserted in lieu thereof; (c) in subdivision (b)(xiii), the expression "measuring over 4.75 mm in thickness, not in coils," is inserted after "steel products", and the expression "manufactured to" is deleted and "suitable for use in the manufacture of line pipe" is inserted in lieu thereof; (d) in subdivision (b)(xvi)(A) the unit of measure "4.55" is deleted and "1.91" is inserted in lieu thereof; (e) in the first line of subdivision (b)(xvii), the expression "or dual phase" is inserted after "(TRIP)"; and in subdivisions (b)(xvii)(A) through (C), inclusive, the following modifications are made at each appearance: "2000 mm to 2499" is deleted and "2.000 mm to 2.499" is inserted in lieu thereof, "2500 mm to 3249" is deleted and "2.500 mm to 3.249" is inserted in lieu thereof, "3250 mm to 3999" is deleted and "3.250 mm to 3.999" is inserted in lieu thereof, and "4000 mm to 6000" is deleted and "4.000 mm to 6.000" is inserted in lieu thereof; (f) in subdivision (b)(xix)(B), the expression "aluminum of 0.015 percent TV" is deleted and "aluminum of 0.04 percent typical value (TV)" is inserted in lieu thereof; (g) in subdivision (b)(xxii)(B), the expression "vanadium 0.15 percent," is inserted after "phosphorus 0.010 percent,"; (h) in the opening language of subdivision (b)(xxiv), the word "hot-rolled" is inserted before "flat-rolled", the expression, "in coils," is inserted after "products", the parenthetical reference is deleted, and the unit of measure "17.8" is deleted and "19.65" is inserted in lieu thereof; (i) in subdivision (b)(xxv), the parenthetical expression "(per mm of width)" is modified to read "(per 25.4 mm of width)"; (j) in subdivision (b)(xxvi), subdivisions (A) and (B) and their subordinate paragraphs are deleted and the following new provisions inserted in lieu thereof:

"(A) uncoated flat products, less than 4.75 mm in thickness, not further worked than cold-rolled, comprising either—

(I) certain uncoated cold-rolled flat-rolled products (of Grade C80M), of a width less than 300 mm and a thickness exceeding 0.25 mm, produced with following chemistries (in percent by weight): carbon content greater

SDGT-15665 0051

# EXHIBIT 5

# U.S. Department of State
## Diplomacy in Action

## Foreign Terrorist Organizations
### BUREAU OF COUNTERTERRORISM

Foreign Terrorist Organizations (FTOs) are foreign organizations that are designated by the Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. FTO designations play a critical role in our fight against terrorism and are an effective means of curtailing support for terrorist activities and pressuring groups to get out of the terrorism business.

### Designated Foreign Terrorist Organizations

| Date Designated | Name |
| --- | --- |
| 10/8/1997 | Abu Sayyaf Group (ASG) |
| 10/8/1997 | Aum Shinrikyo (AUM) |
| 10/8/1997 | Basque Fatherland and Liberty (ETA) |
| 10/8/1997 | Gama'a al-Islamiyya (Islamic Group) (IG) |
| 10/8/1997 | HAMAS |
| 10/8/1997 | Harakat ul-Mujahidin (HUM) |
| 10/8/1997 | Hizballah |
| 10/8/1997 | Kahane Chai (Kach) |
| 10/8/1997 | Kurdistan Workers Party (PKK) (Kongra-Gel) |
| 10/8/1997 | Liberation Tigers of Tamil Eelam (LTTE) |
| 10/8/1997 | National Liberation Army (ELN) |
| 10/8/1997 | Palestine Liberation Front (PLF) |

| | |
|---|---|
| 10/8/1997 | Palestinian Islamic Jihad (PIJ) |
| 10/8/1997 | Popular Front for the Liberation of Palestine (PFLF) |
| 10/8/1997 | PFLP-General Command (PFLP-GC) |
| 10/8/1997 | Revolutionary Armed Forces of Colombia (FARC) |
| 10/8/1997 | Revolutionary People's Liberation Party/Front (DHKP/C) |
| 10/8/1997 | Shining Path (SL) |
| 10/8/1999 | al-Qa'ida (AQ) |
| 9/25/2000 | Islamic Movement of Uzbekistan (IMU) |
| 5/16/2001 | Real Irish Republican Army (RIRA) |
| 12/26/2001 | Jaish-e-Mohammed (JEM) |
| 12/26/2001 | Lashkar-e Tayyiba (LeT) |
| 3/27/2002 | Al-Aqsa Martyrs Brigade (AAMB) |
| 3/27/2002 | Asbat al-Ansar (AAA) |
| 3/27/2002 | al-Qaida in the Islamic Maghreb (AQIM) |
| 8/9/2002 | Communist Party of the Philippines/New People's Army (CPP/NPA) |
| 10/23/2002 | Jemaah Islamiya (JI) |
| 1/30/2003 | Lashkar i Jhangvi (LJ) |
| 3/22/2004 | Ansar al-Islam (AAI) |
| 7/13/2004 | Continuity Irish Republican Army (CIRA) |
| 12/17/2004 | Islamic State of Iraq and the Levant (formerly al-Qa'ida in Iraq) |
| 6/17/2005 | Islamic Jihad Union (IJU) |

# EXHIBIT 5

| | |
|---|---|
| 3/5/2008 | Harakat ul-Jihad-i-Islami/Bangladesh (HUJI-B) |
| 3/18/2008 | al-Shabaab |
| 5/18/2009 | Revolutionary Struggle (RS) |
| 7/2/2009 | Kata'ib Hizballah (KH) |
| 1/19/2010 | al-Qa'ida in the Arabian Peninsula (AQAP) |
| 8/6/2010 | Harakat ul-Jihad-i-Islami (HUJI) |
| 9/1/2010 | Tehrik-e Taliban Pakistan (TTP) |
| 11/4/2010 | Jundallah |
| 5/23/2011 | Army of Islam (AOI) |
| 9/19/2011 | Indian Mujahedeen (IM) |
| 3/13/2012 | Jemaah Anshorut Tauhid (JAT) |
| 5/30/2012 | Abdallah Azzam Brigades (AAB) |
| 9/19/2012 | Haqqani Network (HQN) |
| 3/22/2013 | Ansar al-Dine (AAD) |
| 11/14/2013 | Boko Haram |
| 11/14/2013 | Ansaru |
| 12/19/2013 | al-Mulathamun Battalion |
| 1/13/2014 | Ansar al-Shari'a in Benghazi |
| 1/13/2014 | Ansar al-Shari'a in Darnah |
| 1/13/2014 | Ansar al-Shari'a in Tunisia |
| 4/10/2014 | ISIL Sinai Province (formally Ansar Bayt al-Maqdis) |

SDGT-15665 0054

# EXHIBIT 5

| 5/15/2014 | al-Nusrah Front |
| 8/20/2014 | Mujahidin Shura Council in the Environs of Jerusalem (MSC) |
| 9/30/2015 | Jaysh Rijal al-Tariq al Naqshabandi (JRTN) |
| 1/14/2016 | ISIL-Khorasan (ISIL-K) |
| 5/20/2016 | Islamic State of Iraq and the Levant's Branch in Libya (ISIL-Libya) |
| 6/30/2016 | Al-Qa'ida in the Indian Subcontinent |
| 8/16/2017 | Hizbul Mujahideen (HM) |
| 2/27/2018 | ISIS-Bangladesh |
| 2/27/2018 | ISIS-Philippines |
| 2/27/2018 | ISIS-West Africa |

### Delisted Foreign Terrorist Organizations

| Date Removed | Name | Date Orginally Designated |
| --- | --- | --- |
| 10/8/1999 | Democratic Front for the Liberation of Palestine -Hawatmeh Faction | 10/8/1997 |
| 10/8/1999 | Khmer Rouge | 10/8/1997 |
| 10/8/1999 | Manuel Rodriguez Patriotic Front Dissidents | 10/8/1997 |
| 10/8/2001 | Japanese Red Army | 10/8/1997 |
| 10/8/2001 | Tupac Amaru Revolution Movement | 10/8/1997 |
| 5/18/2009 | Revolutionary Nuclei | 10/8/1997 |
| 10/15/2010 | Armed Islamic Group (GIA) | 10/8/1997 |
| 9/28/2012 | Mujahedin-e Khalq Organization (MEK) | 10/8/1997 |
| 5/28/2013 | Moroccan Islamic Combatant Group (GICM) | 10/11/2005 |

# EXHIBIT 5

| | | |
|---|---|---|
| 7/15/2014 | United Self Defense Forces of Colombia | 9/10/2001 |
| 9/3/2015 | Revolutionary Organization 17 November (17N) | 10/8/1997 |
| 12/9/2015 | Libyan Islamic Fighting Group (LIFG) | 12/17/2004 |
| 6/1/2017 | Abu Nidal Organization (ANO) | 10/8/1997 |

## Identification

The Bureau of Counterterrorism in the State Department (CT) continually monitors the activities of terrorist groups active around the world to identify potential targets for designation. When reviewing potential targets, CT looks not only at the actual terrorist attacks that a group has carried out, but also at whether the group has engaged in planning and preparations for possible future acts of terrorism or retains the capability and intent to carry out such acts.

## Designation

Once a target is identified, CT prepares a detailed "administrative record," which is a compilation of information, typically including both classified and open sources information, demonstrating that the statutory criteria for designation have been satisfied. If the Secretary of State, in consultation with the Attorney General and the Secretary of the Treasury, decides to make the designation, Congress is notified of the Secretary's intent to designate the organization and given seven days to review the designation, as the INA requires. Upon the expiration of the seven-day waiting period and in the absence of Congressional action to block the designation, notice of the designation is published in the Federal Register, at which point the designation takes effect. By law an organization designated as an FTO may seek judicial review of the designation in the United States Court of Appeals for the District of Columbia Circuit not later than 30 days after the designation is published in the Federal Register.

Until recently the INA provided that FTOs must be redesignated every 2 years or the designation would lapse. Under the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA), however, the redesignation requirement was replaced by certain review and revocation procedures. IRTPA provides that an FTO may file a petition for revocation 2 years after its designation date (or in the case of redesignated FTOs, its most recent redesignation date) or 2 years after the determination date on its most recent petition for revocation. In order to provide a basis for revocation, the petitioning FTO must provide evidence that the circumstances forming the basis for the designation are sufficiently different as to warrant revocation. If no such review has been conducted during a 5 year period with respect to a designation, then the Secretary of State is required to review the designation to determine whether revocation would be appropriate. In addition, the Secretary of State may at any time revoke a designation upon a finding that the circumstances forming the basis for the designation have changed in such a manner as to warrant revocation, or that the national security of the United States warrants a revocation. The same procedural requirements apply to revocations made by the Secretary of State as apply to designations. A designation may be revoked by an Act of Congress, or set aside by a Court order.

## Legal Criteria for Designation under Section 219 of the INA as amended

It must be a foreign organization.

SDGT-15665 0056

# EXHIBIT 5

The organization must engage in terrorist activity, as defined in section 212 (a)(3)(B) of the INA (8 U.S.C. § 1182(a)(3)(B)),* (http://2001-2009.state.gov/g/ct/rls/fs/08/103399.htm) or terrorism, as defined in section 140 (d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 (22 U.S.C. § 2656f(d)(2)),** (http://2001-2009.state.gov/g/ct/rls/fs/08/103401.htm) or retain the capability and intent to engage in terrorist activity or terrorism.

The organization's terrorist activity or terrorism must threaten the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States.

**Legal Ramifications of Designation**

It is unlawful for a person in the United States or subject to the jurisdiction of the United States to knowingly provide "material support or resources" to a designated FTO. (The term "material support or resources" is defined in 18 U.S.C. § 2339A(b)(1) as " any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who maybe or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(2) provides that for these purposes "the term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge." 18 U.S.C. § 2339A(b)(3) further provides that for these purposes the term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge."

Representatives and members of a designated FTO, if they are aliens, are inadmissible to and, in certain circumstances, removable from the United States (see 8 U.S.C. §§ 1182 (a)(3)(B)(i)(IV)-(V), 1227 (a)(1)(A)).

Any U.S. financial institution that becomes aware that it has possession of or control over funds in which a designated FTO or its agent has an interest must retain possession of or control over the funds and report the funds to the Office of Foreign Assets Control of the U.S. Department of the Treasury.

**Other Effects of Designation**

Supports our efforts to curb terrorism financing and to encourage other nations to do the same.

Stigmatizes and isolates designated terrorist organizations internationally.

Deters donations or contributions to and economic transactions with named organizations.

Heightens public awareness and knowledge of terrorist organizations.

Signals to other governments our concern about named organizations.

**Revocations of Foreign Terrorist Organizations**

The Immigration and Nationality Act sets out three possible basis for revoking a Foreign Terrorist Organization designation:

The Secretary of State must revoke a designation if the Secretary finds that the circumstances that were the basis of the designation have changed in such a manner as to warrant a revocation;

The Secretary of State must revoke a designation if the Secretary finds that the national security of the United States warrants a revocation;

The Secretary of State may revoke a designation at any time.

# EXHIBIT 5

Any revocation shall take effect on the date specified in the revocation or upon publication in the Federal Register if no effective date is specified. The revocation of a designation shall not affect any action or proceeding based on conduct committed prior to the effective date of such revocation.

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).

SDGT-15665 0058

# EXHIBIT 6

SDGT-15665 0059

5079

## Presidential Documents

Federal Register

Vol. 60, No. 16

Wednesday, January 25, 1995

Title 3—

The President

Executive Order 12947 of January 23, 1995

**Prohibiting Transactions With Terrorists Who Threaten To Disrupt the Middle East Peace Process**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701        ) (IEEPA), the National Emergencies Act (50 U.S.C. 1601        ), and section 301 of title 3, United States Code,

I, WILLIAM J. CLINTON, President of the United States of America, find that grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and hereby declare a national emergency to deal with that threat.

I hereby order:

**Section 1.** Except to the extent provided in section 203(b)(3) and (4) of IEEPA (50 U.S.C. 1702(b)(3) and (4)) and in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date: (a) all property and interests in property of:

(i) the persons listed in the Annex to this order;

(ii) foreign persons designated by the Secretary of State, in coordination with the Secretary of the Treasury and the Attorney General, because they are found:

(A) to have committed, or to pose a significant risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East peace process, or

(B) to assist in, sponsor, or provide financial, material, or technological support for, or services in support of, such acts of violence; and

(iii) persons determined by the Secretary of the Treasury, in coordination with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of, any of the foregoing persons, that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of United States persons, are blocked;

(b) any transaction or dealing by United States persons or within the United States in property or interests in property of the persons designated in or pursuant to this order is prohibited, including the making or receiving of any contribution of funds, goods, or services to or for the benefit of such persons;

(c) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order, is prohibited.

**Sec. 2.** For the purposes of this order: (a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, corporation, or other organization, group, or subgroup;

# EXHIBIT 6

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term "foreign person" means any citizen or national of a foreign state (including any such individual who is also a citizen or national of the United States) or any entity not organized solely under the laws of the United States or existing solely in the United States, but does not include a foreign state.

**Sec. 3.** I hereby determine that the making of donations of the type specified in section 203(b)(2)(A) of IEEPA (50 U.S.C. 1702(b)(2)(A)) by United States persons to persons designated in or pursuant to this order would seriously impair my ability to deal with the national emergency declared in this order, and hereby prohibit, such donations as provided by section 1 of this order.

**Sec. 4.** (a) The Secretary of the Treasury, in consultation with the Secretary of State and, as appropriate, the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to me by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

(b) Any investigation emanating from a possible violation of this order, or of any license, order, or regulation issued pursuant to this order, shall first be coordinated with the Federal Bureau of Investigation (FBI), and any matter involving evidence of a criminal violation shall be referred to the FBI for further investigation. The FBI shall timely notify the Department of the Treasury of any action it takes on such referrals.

**Sec. 5.** Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 6.** (a) This order is effective at 12:01 a.m., eastern standard time on January 24, 1995.

(b) This order shall be transmitted to the Congress and published in the **Federal Register**.

William Clinton

THE WHITE HOUSE,

Billing code 3195-01-P

# EXHIBIT 6

ANNEX

TERRORIST ORGANIZATIONS WHICH THREATEN TO DISRUPT THE MIDDLE EAST PEACE
PROCESS

Abu Nidal Organization (ANO)
Democratic Front for the Liberation of Palestine (DFLP)
Hizballah
Islamic Gama'at (IG)
Islamic Resistance Movement (HAMAS)
Jihad
Kach
Kahane Chai
Palestinian Islamic Jihad-Shiqaqi faction (PIJ)
Palestine Liberation Front-Abu Abbas faction (PLF-Abu Abbas)
Popular Front for the Liberation of Palestine (PFLP)
Popular Front for the Liberation of Palestine-General Command (PFLP-GC)

[FR Doc. 95-2040
Filed 1-24-95; 12:30 pm]
Billing code 4810-21-P

SDGT-15665 0083

Texas-New Mexico Railroad, located in New Mexico and Texas; and (6) West Texas & Lubbock Railway, located in Texas.

IPH/PBR represent that: (1) The Line does not connect with any other railroads in the corporate family; (2) the transaction is not part of a series of anticipated transactions that would connect the Line with any other railroads in the corporate family; and (3) the transaction does not involve a Class I rail carrier. Therefore, the transaction is exempt from the prior approval requirements of 49 U.S.C. 11323. *See* 49 CFR 1180.2(d)(2).

Under 49 U.S.C. 10502(g), the Board may not use its exemption authority to relieve a rail carrier of its statutory obligation to protect the interests of its employees. Section 11326(c), however, does not provide for labor protection for transactions under sections 11324 and 11325 that involve only Class III rail carriers. Accordingly, the Board may not impose labor protective conditions here, because all of the carriers involved are Class III carriers.

If the verified notice contains false or misleading information, the exemption is void *ab initio*. Petitions to revoke the exemption under 49 U.S.C. 10502(d) may be filed at any time. The filing of a petition to revoke will not automatically stay the effectiveness of the exemption. Stay petitions must be filed no later than August 24, 2012 (at least 7 days before the exemption becomes effective).

An original and 10 copies of all pleadings, referring to Docket No. FD 35632, must be filed with the Surface Transportation Board, 395 E Street SW., Washington, DC 20423–0001. In addition, one copy of each pleading must be served on John D. Heffner, Strasburger & Price, LLP, 1700 K Street NW., Suite 640, Washington, DC 20006.

Board decisions and notices are available on our Web site at *www.stb.dot.gov.*

Decided: August 14, 2012.

By the Board, Rachel D. Campbell, Director, Office of Proceedings.

**Derrick A. Gardner,**

*Clearance Clerk.*

[FR Doc. 2012–20240 Filed 8–16–12; 8:45 am]

BILLING CODE 4915–01–P

## DEPARTMENT OF THE TREASURY

### Office of the Secretary

### List of Countries Requiring Cooperation With an International Boycott

In accordance with section 999(a)(3) of the Internal Revenue Code of 1986, the Department of the Treasury is publishing a current list of countries which require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986).

On the basis of the best information currently available to the Department of the Treasury, the following countries require or may require participation in, or cooperation with, an international boycott (within the meaning of section 999(b)(3) of the Internal Revenue Code of 1986).

Iraq
Kuwait
Lebanon
Libya
Qatar
Saudi Arabia
Syria
United Arab Emirates
Yemen

Dated: August 13, 2012.

**Danielle Rolfes,**

*Acting International Tax Counsel, Tax Policy.*

[FR Doc. 2012–20182 Filed 8–16–12; 8:45 am]

BILLING CODE 4810–25–M

## DEPARTMENT OF THE TREASURY

### Office of Foreign Assets Control

### Designation of One (1) Entity Pursuant to Executive Order 13582 of August 17, 2011, "Blocking Property of the Government of Syria and Prohibiting Certain Transactions With Respect to Syria"

**AGENCY:** Office of Foreign Assets Control, Treasury.

**ACTION:** Notice.

**SUMMARY:** The Treasury Department's Office of Foreign Assets Control ("OFAC") is publishing the name of one (1) entity whose property and interests in property are blocked pursuant to Executive Order 13582 of August 17, 2011, "Blocking Property of the Government of Syria and Prohibiting Certain Transactions With Respect to Syria."

**DATES:** The designation by the Director of OFAC of the one (1) entity identified in this notice, pursuant to Executive

Order 13582, is effective on August 10, 2012.

**FOR FURTHER INFORMATION CONTACT:** Assistant Director, Compliance Outreach & Implementation, Office of Foreign Assets Control, Department of the Treasury, 1500 Pennsylvania Avenue NW., (Treasury Annex), Washington, DC 20220, Tel.: 202/622–2490.

**SUPPLEMENTARY INFORMATION:**

### Electronic and Facsimile Availability

This document and additional information concerning OFAC are available from OFAC's Web site (*www.treas.gov/ofac*) or via facsimile through a 24-hour fax-on-demand service, Tel.: 202/622–0077.

### Background

On August 17, 2011, the President issued Executive Order 13582, "Blocking Property of the Government of Syria and Prohibiting Certain Transactions With Respect to Syria," (the "Order") pursuant to, *inter alia,* the International Emergency Economic Powers Act (50 U.S.C. 1701–06). In the Order, the President took additional steps with respect to the national emergency declared in Executive Order 13338 of May 11, 2004, which was modified in scope and relied upon for additional steps taken in Executive Order 13399 of April 25, 2006, Executive Order 13460 of February 13, 2008, Executive Order 13572 of April 29, 2011, and Executive Order 13573 of May 18, 2011.

Section 1 of the Order blocks, with certain exceptions, all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any overseas branch, of (1) the Government of Syria; (2) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, (a) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, any person whose property and interests in property are blocked pursuant to the Order; or (b) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to the Order.

On August 10, 2012, the Director of OFAC, in consultation with the Department of State, designated, pursuant to one or more of the criteria set forth in subsection 1(b) of the Order,

SDGT-15665 0069

one (1) entity whose property and interests in property are blocked pursuant to Executive Order 13582.

The listing for the entity on OFAC's list of Specially Designated Nationals and Blocked Persons appear as follows:

**Entity**

1. HIZBALLAH (a.k.a. ANSAR ALLAH; a.k.a. FOLLOWERS OF THE PROPHET MUHAMMED; a.k.a. ISLAMIC JIHAD; a.k.a. ISLAMIC JIHAD FOR THE LIBERATION OF PALESTINE; a.k.a. ISLAMIC JIHAD ORGANIZATION; a.k.a. ORGANIZATION OF RIGHT AGAINST WRONG; a.k.a. ORGANIZATION OF THE OPPRESSED ON EARTH; a.k.a. PARTY OF GOD; a.k.a. REVOLUTIONARY JUSTICE ORGANIZATION) [FTO] [SDGT] [SDT] [SYRIA].

Dated: August 13, 2012.

**Barbara C. Hammerle,**
*Acting Director, Office of Foreign Assets Control.*

[FR Doc. 2012–20194 Filed 8–16–12; 8:45 am]

BILLING CODE 4810–AL–P

## DEPARTMENT OF VETERANS AFFAIRS

### Notice of Availability of an Environmental Impact Statement (EIS) for the San Francisco Veterans Affairs Medical Center (SFVAMC) Long Range Development Plan (LRDP)

**AGENCY:** Department of Veterans Affairs (VA).

**ACTION:** Notice of availability.

**SUMMARY:** Pursuant to the National Environmental Policy Act (NEPA) of 1969, as amended, (42 U.S.C. 4331 *et seq.*), the Council on Environmental Quality Regulations for Implementing the Procedural Requirements of NEPA (40 CFR parts 1500–1508), VA's Implementing Regulations (38 CFR part 26), as well as the settlement agreement resulting from *Planning Association for Richmond, et al.* v. *U.S. Department of Veterans Affairs,* C–06–02321–SBA (filed 6 June 2008), VA has prepared a Draft EIS for the proposed implementation of the SFVAMC LRDP in San Francisco, California. The SFVAMC LRDP involves development and construction of patient care buildings, research buildings, business occupancy buildings, and parking structures, as well as retrofitting seismically deficient buildings. The Draft EIS identifies and evaluates environmental factors associated with new construction, demolition, as well as seismic retrofit to upgrade the SFVAMC

for purposes of meeting the needs of Veterans of the North Coast and San Francisco Bay Area over the next 20 years.

**DATES:** Interested parties are invited to submit comments in writing on the SFVAMC LRDP Draft EIS by October 16, 2012. Interested parties are also invited to participate in a public meeting regarding the SFVAMC LRDP Draft EIS on September 20, 2012 at SFVAMC (4150 Clement Street, San Francisco, CA 94121, Building 7, 1st Floor, Auditorium) at 5 p.m. At the public meeting, interested parties will also have the opportunity to comment regarding the National Historic Preservation Act Section 106 process.

**ADDRESSES:** Submit written comments on the SFVAMC LRDP Draft EIS through *www.regulations.gov.* Please refer to: "SFVAMC LRDP Draft EIS" in any correspondence.

**FOR FURTHER INFORMATION CONTACT:** Chief Engineer, Engineering Service (138), San Francisco Veterans Affairs Medical Center, 4150 Clement Street, San Francisco, CA 94121 or by telephone, (415) 221–4810, extension 2009. The SFVAMC LRDP and LRDP Draft EIS are available for viewing on the SFVAMC Web site: *http://www.sanfrancisco.va.gov/planning.*

**SUPPLEMENTARY INFORMATION:** VA operates the SFVAMC, located at Fort Miley in San Francisco, California. It is the only VAMC in the City and County of San Francisco and is considered an aging facility with need for retrofitting and expansion. The SFVAMC has identified a need for retrofitting existing buildings to the most recent seismic safety requirements and for an additional 589,000 square feet of building space (in addition to the existing nearly one million square feet of building space) to meet the needs of San Francisco Bay Area and northern California coast Veterans over the next 20 years.

Three alternatives were evaluated in the Draft EIS. *Alternative 1* would include the addition of 244,000 square feet (or 394,000 square feet including parking structure space) of medical and research space and seismic retrofit of nine existing buildings at the existing SFVAMC site, a 29-acre site located at Fort Miley in the northwestern portion of San Francisco. *Alternative 2* would include the addition of 124,000 square feet (or 274,000 square feet including parking structure space) of medical and research space and seismic retrofit of nine existing buildings at the existing SFVAMC site as well as the construction of 350,000 square feet (or

620,000 square feet including parking structure space) of new ambulatory care and research space at a new alternate site in the Mission Bay area of San Francisco. *Alternative 3* is the No Action Alternative.

Environmental topics that have been addressed in the Draft EIS include: aesthetics, air quality, community services, cultural resources, coastal management, geology and soils, greenhouse gas emissions, hydrology and water quality, land use, noise, socioeconomics, hazards, transportation and parking, utilities, and biological resources. Relevant and reasonable measures that could alleviate environmental effects have been considered and are included where relevant within the Draft EIS.

Information related to the EIS process, including notices of public meetings, will be available for viewing on the SFVAMC Web site: *http://www.sanfrancisco.va.gov/.*

Approved: August 9, 2012.

**John R. Gingrich,**
*Chief of Staff, Department of Veterans Affairs.*

[FR Doc. 2012–20243 Filed 8–16–12; 8:45 am]

BILLING CODE 8320–01–P

## DEPARTMENT OF VETERANS AFFAIRS

### Geriatrics and Gerontology Advisory Committee, Notice of Meeting

The Department of Veterans Affairs (VA) gives notice under Public Law 92–463 (Federal Advisory Committee Act) that a meeting of the Geriatrics and Gerontology Advisory Committee will be held on September 5–6, 2012, in Room C–7 at the Department of Veterans Affairs, 810 Vermont Avenue NW., Washington, DC. On September 5, the session will begin at 8:30 a.m. and end at 5 p.m. On September 6, the session will begin at 8 a.m. and end at 12 noon. This meeting is open to the public.

The purpose of the Committee is to provide advice to the Secretary of Veterans Affairs and the Under Secretary for Health on all matters pertaining to geriatrics and gerontology. The Committee assesses the capability of VA health care facilities and programs to meet the medical, psychological, and social needs of older Veterans and evaluates VA programs designated as Geriatric Research, Education, and Clinical Centers.

The meeting will feature presentations and discussions on VA's geriatrics and extended care programs, aging research activities, updates on VA's employee staff working in the area of geriatrics (to include training,

Evidentiary Memorandum

Exhibit 8 Withheld in Full

Bates Numbers: SDGT-15665 0064-0067

Evidentiary Memorandum

Exhibit 9 Withheld in Full

Bates Numbers: SDGT-15665 0068-0072

Releasable Information from Exhibit 9:

Wa'el Bazzi

Evidentiary Memorandum

Exhibit 10 Withheld in Full

Bates Numbers: SDGT-15665 0073-0076

Releasable Information from Exhibit 10:

Wa'il Muhammad Bazzi

Evidentiary Memorandum

Exhibit 11 Withheld in Full

Bates Numbers: SDGT-15665 0077-0081

Evidentiary Memorandum

Exhibit 12 Withheld in Full

Bates Numbers: SDGT-15665 0082-0086

Evidentiary Memorandum

Exhibit 13 Withheld in Full

Bates Numbers: SDGT-15665 0087-0089

Evidentiary Memorandum

Exhibit 14 Withheld in Full

Non-Responsive


Bates Numbers: SDGT-15665 0090-0091

Evidentiary Memorandum

Exhibit 15 Withheld in Full

Non-Responsive

Bates Numbers: SDGT-15665 0092-0094

Evidentiary Memorandum

Exhibit 16 Withheld in Full

Non-Responsive


Bates Numbers: SDGT-15665 0095-0096

Evidentiary Memorandum

Exhibit 17 Withheld in Full

Non-Responsive

Bates Numbers: SDGT-15665 0097-0100

Evidentiary Memorandum

Exhibit 18 Withheld in Full

Non-Responsive


Bates Numbers: SDGT-15665 0101-0102

Evidentiary Memorandum

Exhibit 19 Withheld in Full

Non-Responsive


Bates Numbers: SDGT-15665 0103-0104

Evidentiary Memorandum

Exhibit 20 Withheld in Full

Non-Responsive

Bates Numbers: SDGT-15665 0105-0107

**FILE COPY**

Exhibit 21



# CERTIFICATE OF INCORPORATION
# OF A
# PRIVATE LIMITED COMPANY

Company Number **11207847**

The Registrar of Companies for England and Wales, hereby certifies that

**BSQRD LIMITED**

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **15th February 2018**



* N11207847H *



Companies House



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES

SDGT-15665 0108



**Companies House**

Exhibit 21

# IN01 (ef)



| Application to register a company |
| --- |



*Received for filing in Electronic Format on the:* **14/02/2018**

X6ZR049M

---

*Company Name in full:*     **BSQRD LIMITED**

*Company Type:*     **Private company limited by shares**

*Situation of Registered Office:*     **England and Wales**

*Proposed Registered Office Address:*     **MANSION HOUSE MANCHESTER ROAD
ALTRINCHAM
CHESHIRE
ENGLAND WA14 4RW**

*Sic Codes:*     **62090**

*I wish to partially adopt the following model articles:>*         **Private (Ltd by Shares)**

---

**Electronically filed document for Company Number:**     **11207847**

SDGT-15665 0109

2

## *Proposed Officers*                    Exhibit 21

---

## *Company Director*          *1*

| | |
|---|---|
| *Type:* | **Person** |
| *Full Forename(s):* | **WAEL** |
| *Surname:* | **BAZZI** |
| *Service Address:* | **recorded as Company's registered office** |
| *Country/State Usually Resident:* | **BELGIUM** |

*Date of Birth:* ▮▮▮/1989          *Nationality:*   **BELGIAN**

*Occupation:*   **DIRECTOR**

*The subscribers confirm that the person named has consented to act as a director.*

---

**Electronically filed document for Company Number:**          **11207847**

## *Statement of Capital (Share Capital)*     Exhibit 21

| Class of Shares: | **ORDINARY GBP SHARES** | Number allotted | **2** |
| --- | --- | --- | --- |
| | | Aggregate nominal value: | **2** |
| Currency: | **GBP** | | |
| Prescribed particulars | | | |

**FULL RIGHTS WITH REGARDS TO VOTING, PARTICIPATION AND DIVIDENDS.**

### Statement of Capital (Totals)

| Currency: | **GBP** | Total number of shares: | **2** |
| --- | --- | --- | --- |
| | | Total aggregate nominal value: | **2** |
| | | Total aggregate unpaid: | **0** |

## *Initial Shareholdings*

Exhibit 21

| | | | |
|---|---|---|---|
| *Name:* | **WAEL BAZZI** | | |
| *Address* | **MANSION HOUSE** | *Class of Shares:* | **ORDINARY GBP** |
| | **MANCHESTER ROAD** | | **SHARES** |
| | **ALTRINCHAM** | | |
| | **CHESHIRE** | *Number of shares:* | **1** |
| | **ENGLAND** | *Currency:* | **GBP** |
| | **WA14 4RW** | *Nominal value of each share:* | **1** |
| | | *Amount unpaid:* | **0** |
| | | *Amount paid:* | **1** |
| *Name:* | **HUSSEIN BAZZI** | | |
| *Address* | **MANSION HOUSE** | *Class of Shares:* | **ORDINARY GBP** |
| | **MANCHESTER ROAD** | | **SHARES** |
| | **ALTRINCHAM** | | |
| | **CHESHIRE** | *Number of shares:* | **1** |
| | **ENGLAND** | *Currency:* | **GBP** |
| | **WA14 4RW** | *Nominal value of each share:* | **1** |
| | | *Amount unpaid:* | **0** |
| | | *Amount paid:* | **1** |

## *Persons with Significant Control (PSC)*    Exhibit 21

**Statement of initial significant control**

On incorporation, there will be someone who will count as a Person with Significant Control (either a registerable person or relevant legal entity (RLE)) in relation to the company

## *Individual Person with Significant Control details* Exhibit 21

*Names:*　　　　　**WAEL BAZZI**

*Country/State Usually*　　**BELGIUM**
*Resident:*

*Date of Birth:*　▓▓/1989　　　　*Nationality:*　**BELGIAN**

*Service address recorded as Company's registered office*

*The subscribers confirm that each person named as an individual PSC in this application knows that their particulars are being supplied as part of this application.*

---

**Electronically filed document for Company Number:**　　**11207847**　　SDGT-15665 0114

Exhibit 21

*Nature of control*       The person holds, directly or indirectly, more than 25% but not more than 50% of the shares in the company.

*Nature of control*       The person holds, directly or indirectly, more than 25% but not more than 50% of the voting rights in the company.

*Individual Person with Significant Control details* Exhibit 21

---

*Names:*                    **HUSSEIN KASSEM BAZZI**

*Country/State Usually*     **LEBANON**
*Resident:*

*Date of Birth:*  ███/**1992**           *Nationality:*    **LEBANESE**

*Service address recorded as Company's registered office*

*The subscribers confirm that each person named as an individual PSC in this application knows that their particulars are being supplied as part of this application.*

---

*Nature of control*            The person holds, directly or indirectly, more than 25% but not
more than 50% of the shares in the company.

*Nature of control*            The person holds, directly or indirectly, more than 25% but not
more than 50% of the voting rights in the company.

## *Statement of Compliance*

Exhibit 21

*I confirm the requirements of the Companies Act 2006 as to registration have been complied with.*

| | |
|---|---|
| *Name:* | **WAEL BAZZI** |
| *Authenticated* | **YES** |
| *Name:* | **HUSSEIN BAZZI** |
| *Authenticated* | **YES** |

## **Authorisation**

*Authoriser Designation:*   **subscriber**                    *Authenticated*   **YES**

---

**Electronically filed document for Company Number:**          **11207847**          SDGT-15665 0118

SCHEDULE 1

Exhibit 21

## COMPANY HAVING A SHARE CAPITAL

Memorandum of association of:
**BSQRD LIMITED**

Each Subscriber to this Memorandum of Association wishes to form a company under the Companies Act 2006 and agrees to become a member of the company and to take at least one share.

*Name of each subscriber:*

WAEL BAZZI
HUSSEIN KASSEM BAZZI


DATED: ▇▇▇▇▇▇▇

**THE COMPANIES ACT 2006**
**PRIVATE COMPANY LIMITED BY SHARES**
**ARTICLES OF ASSOCIATION**
**BSQRD LIMITED**

Exhibit 21

### INDEX TO THE ARTICLES

PART 1 INTERPRETATION AND LIMITATION OF LIABILITY

1 Defined terms
2 Liability of members

PART 2 DIRECTORS

DIRECTORS' POWERS AND RESPONSIBILITIES

3 Directors' general authority
4 Shareholders' reserve power
5 Directors may delegate
6 Committees

DECISION-MAKING BY DIRECTORS

7 Directors to take decisions collectively
8 Unanimous decisions
9 Calling a directors' meeting
10 Participation in directors' meetings
11 Quorum for directors' meetings
12 Chairing of directors' meetings
13 Casting vote
14 Conflicts of interest
15 Records of decisions to be kept
16 Directors' discretion to make further rules

APPOINTMENT OF DIRECTORS

17 Methods of appointing directors
18 Termination of director's appointment
19 Directors' remuneration
20 Directors' expenses

PART 3 SHARES AND DISTRIBUTIONS

SHARES

21 Issue and transfer of shares
22 Powers to issue different classes of share
23 Company not to be bound by less than absolute interests
24 Share certificates
25 Replacement share certificates
26 Share transfers
27 Transmission of shares
28 Exercise of transmittees' rights
29 Transmittees bound by prior notices

DIVIDENDS AND OTHER DISTRIBUTIONS

30 Procedure for declaring dividends
31 Payment of dividends and other distributions
32 No interest on distributions
33 Unclaimed distributions
34 Non-cash distributions
35 Waiver of distributions

CAPITALISATION OF PROFITS

36 Authority to capitalise, and appropriation of capitalised sums

PART 4. DECISION-MAKING BY SHAREHOLDERS

ORGANISATION OF GENERAL MEETINGS

37 Attendance and speaking at general meetings
38 Quorum for general meetings
39 Chairing general meetings
40 Attendance and speaking by directors and non-shareholders
41 Adjournment

VOTING AT GENERAL MEETINGS

42 Voting: general
43 Errors and disputes
44 Poll votes
45 Content of proxy notices
46 Delivery of proxy notices
47 Amendments to resolutions

PART 5

ADMINISTRATIVE ARRANGEMENTS

48 Means of communication to be used
49 Company seals
50 No right to inspect accounts and other records
51 Provision for employees on cessation of business

DIRECTORS' INDEMNITY AND INSURANCE

52 Indemnity
53 Insurance
54 Lien
55 Place of Jurisdiction and Choice of Law

## PART 1: INTERPRETATION AND LIMITATION OF LIABILITY

Exhibit 21

**Defined terms**

1. In the articles, unless the context requires otherwise—

"articles" means the company's articles of association,

"associated company" has the meaning given in article 53,

"bankruptcy" includes individual insolvency proceedings in a jurisdiction other than England and Wales or Northern Ireland which have an effect similar to that of bankruptcy,

"chairman" has the meaning given in article 12,

"chairman of the meeting" has the meaning given in article 39,

"Companies Acts" means the Companies Acts (as defined in section 2 of the Companies Act 2006), insofar as they apply to the company,

"director" means a director of the company, and includes any person occupying the position of director, by whatever name called,

"distribution recipient" has the meaning given in article 38,

"document" includes, unless otherwise specified, any document sent or supplied in electronic form,

"electronic form" has the meaning given in section 1168 of the Companies Act 2006,

"fully paid", in relation to a share," means that the nominal value and any premium to be paid to the company in respect of that share have been paid to the company,

"hard copy form" has the meaning given in section 1168 of the Companies Act 2006,

"holder", in relation to shares, means the person whose name is entered in the register of members as the holder of the shares,

"instrument" means a document in hard copy form,

"ordinary resolution" has the meaning given in section 282 of the Companies Act 2006,

"paid" means paid or credited as paid,

"participate", in relation to a directors' meeting, has the meaning given in article 10,

"proxy notice" has the meaning given in article 45,

"shareholder" means a person who is the holder of a share

"shares" means shares in the company,

"special resolution" has the meaning given in section 283 of the Companies Act 2006,

"subsidiary" has the meaning given in section 1159 of the Companies Act 2006,

"transmittee" means a person entitled to a share by reason of the death or bankruptcy of a shareholder or otherwise by operation of law, and

"writing" means the representation or reproduction of words, symbols or other information in a visible form by any method or combination of methods, whether sent or supplied in electronic form or otherwise

Unless the context otherwise requires, other words or expressions contained in these articles bear the same meaning as in the Companies Act 2006 as are in force on the date when these articles become binding on the company

**Liability of members**

2 The liability of the members is limited to the amount, if any, unpaid on the shares held by them

## PART 2: DIRECTORS
## DIRECTORS' POWERS AND RESPONSIBILITIES

**Directors' general authority**

3 (1) Subject to the articles, the directors are responsible for the management of the company's business for which purpose they may exercise all the powers of the company, and the company shall conduct business as a general commercial company, and have all of the powers of a natural person, in accordance with the provisions of the Companies Act 2006

(2) If the company has only one director, that director shall be the sole legal representative of the company, in accordance with these articles

(3) If the company has more than one director, two directors shall be the legal representatives of the company, in accordance with these articles

(4) The directors of the company shall not permit the company to engage in the business of banking or in the trading of financial security instruments other than for its own account, neither shall the representatives, nor the directors of a branch of the company which is not based or situate in the UK, be allowed to undertake any action or activity in their banking or the dealing in securities

(5) The directors may establish one or more branch offices of the company outside the geographical territory of Great Britain and Northern Ireland

**Shareholders' reserve power**

4 (1) The shareholders may, by special resolution, direct the directors to take, or refrain from taking, specified action.

(2) No such special resolution invalidates anything which the directors have done before the passing of the resolution

**Directors may delegate**

5 (1) Subject to the articles, the directors may delegate any of the powers conferred on them by and under the articles

(a) to such person or committee,

(b) by such means (including by power of attorney),

(c) to such an extent,

(d) in relation to such matters or territories, and

(e) or such terms and conditions

as they shall think fit.

(2) If the directors so specify, any such delegation may authorise further delegation of the directors' powers by any person to whom they are so delegated

(3) The directors may revoke any delegation in whole or part, or alter its terms and conditions, at any time, such revocation to be valid from its notification by the delegator to the delegate

(4) The directors may appoint a company secretary of the company for such period of time and subject to and on such terms and conditions as they deem fit and the tenure of the company secretary shall continue until such time as their appointment is terminated

(5) A director may appoint, according to specific terms in writing by giving written notice to the company, any other consenting person as an alternate director to exercise all rights, functions and responsibilities of the appointing director for a fixed period of time, and such alternate director shall be subject to any resolutions otherwise applicable to the appointing director, during the absence of the appointing director, as provided for in these articles in relation to the company

However, the alternate director shall be liable for his or her own acts and omissions and shall not be deemed to be the agent of, nor acting for, the appointing director for those acts or omissions, and the appointment of the alternate director shall terminate when revoked by the appointor, or in accordance with the terms contained in the written notice of appointment, or when the director ceases to be a director of the appointor terminates or is terminated for whatever reason.

**Committees**

6 (1) Committees to which the directors delegate any of their powers must follow procedures which are based as far as applicable on those provisions of the articles which govern the taking of decisions by directors

(2) The directors may make procedural rules for all or any committees, which shall prevail over rules derived from the articles if they are not consistent with them

## DECISION-MAKING BY DIRECTORS

**Directors to take decisions collectively**

7 (1) The general rule about decision-making by directors is that any decision of the directors must be either a majority decision at a meeting or a decision taken in accordance with article 8

(2) If—

(a) the company only has one director, and

(b) no provision of the articles requires it to have more than one director

the general rule does not apply, and the director may take decisions without regard to any of the provisions of the articles relating to directors' decision-making

**Unanimous decisions**

8 (1) A decision of the directors is taken in accordance with this article when all eligible directors indicate to each other by any means that they share a common view on a matter

(2) Such a decision may take the form of a resolution in writing, copies of which have been signed by each eligible director, or to which each eligible director has otherwise indicated agreement in writing

(3) References in this article to eligible directors are to directors who would have been entitled to vote on the matter had it been proposed as a resolution at a directors' meeting

(4) A decision may not be taken in accordance with this article if the eligible directors would not have formed a quorum at such a meeting

**Calling a directors' meeting**

9 (1) Any director may call a directors' meeting by giving notice of the meeting to the directors or by authorising the company secretary (if any) to give such notice

(2) Notice of a directors' meeting must be given to each director, but need not be in writing

(3) Notice of a directors' meeting need not be given to directors who waive their entitlement to notice of that meeting, by giving notice to that effect to the company not more than seven (7) days after the date on which the meeting is held Where such notice is given after the meeting has been held, that does not affect the validity of the meeting, or of any business conducted at it

**Participation in directors' meetings**

10 (1) Subject to the articles, directors participate in a directors' meeting, or part of a directors' meeting, when

(a) the meeting has been called and takes place in accordance with the articles, and

(b) they can each communicate to the others any information or opinions they have on any particular item of business of the meeting

(2) In determining whether directors are participating in a directors' meeting, it is irrelevant where any director is or how they communicate with each other

(3) If all the directors participating in a meeting are not in the same place, they may decide that the meeting is to be treated as taking place wherever any of them is situate

**Quorum for directors' meetings**

11 (1) At a directors' meeting, unless a quorum is participating, no proposal is to be voted on, except a proposal to call another meeting

(2) The quorum for directors' meetings may be fixed from time to time by a decision of the directors, but it must never be less than two, and unless otherwise fixed it is two

is to be at least two
(3) If the total number of directors for the time being is less than the quorum required, the directors must not take any decision other than a decision
    (a) to appoint further directors, or
    (b) to call a general meeting so as to enable the shareholders to appoint
    further directors.

**Exhibit 21**

**Chairing of directors' meetings**

12  (1) The directors may appoint a director to chair their meetings.
(2) The person so appointed for the time being is known as the chairman.
(3) The directors may terminate the chairman's appointment at any time.
(4) If the chairman is not participating in a directors' meeting within ten minutes of the time at which it was due to start, the participating directors, wheresoever present, must appoint one of their number to chair it.

**Casting vote**

13  (1) If the numbers of votes for and against a proposal are equal, the chairman or other director chairing the meeting has a casting vote.
(2) This casting vote shall not apply if, in accordance with the articles, the chairman or other director is not to be counted as participating in the decision-making process for quorum or voting purposes.

**Conflicts of interest**

14  A director shall declare any direct or indirect conflicts of interest – or both – in relation to any transaction with the company, including all relevant details relating thereto, in advance of negotiations being entered into upon the relevant transaction, in writing to the other directors, if any, otherwise to all shareholders, and shall obtain written approval in advance from all other directors, if any, or shareholders as may be applicable in relation to each particular case, that the director may vote in relation to the matter at issue.

**Records of decisions to be, kept**

15  The directors must ensure that the company keeps a record, in writing, for at least ten (10) years from the date of the decision recorded, of every unanimous or majority decision taken by the directors, be that decision in favour of, or against, the motion decided upon.

**Directors' discretion to make further rules**

16  Subject to the articles, the directors may make any rule which they think fit as to how they take decisions, and on how such rules are to be recorded or communicated to directors.

APPOINTMENT OF DIRECTORS

**Methods of appointing directors**

17  (1) Any person who is willing to act as a director, and is permitted by law so to do, may be appointed as a director
    (a) by ordinary resolution, or
    (b) by a decision of the directors.
(2) In any case where, as a result of death, the company has no shareholders and no directors, the personal representatives of the last surviving shareholder to have the right, by notice in writing to the company at its registered office, receipt of such notice to be obtained, to appoint a person to be a director.
(3) For the purposes of sub-paragraph (2) above, where two or more shareholders die in circumstances rendering it uncertain who was the last to die, a younger shareholder is deemed to have survived an older shareholder or shareholders.

**Termination of director's appointment**

18  A person ceases to be a director upon
    (a) that person ceasing to be a director by virtue of any provision of the Companies Act 2006 or is prohibited from being a director by law;
    (b) a bankruptcy order being made against that person;
    (c) a composition being made with that person's creditors generally in satisfaction of that person's debts;
    (d) a registered medical practitioner who is treating that person giving a written opinion to the company stating that that person has become physically or mentally incapable of acting as a director and may remain so for more than three months;
    (e) that person's mental health causing a court to make an order which wholly or partly prevents that person from personally exercising any powers or rights which that person would otherwise have, or
    (f) notification being received by the company from the director that the director is resigning from office, and such resignation has taken effect in accordance with its terms.

**Directors' remuneration**

19  (1) Directors may undertake any services for the company that the directors decide.
(2) Directors are entitled to such remuneration as the directors determine
    (a) for their services to the company as directors, and
    (b) for any other service which they undertake for the company
(3) Subject to the articles, a director's remuneration may
    (a) take any form, and
    (b) include any arrangements in connection with the payment of a pension, allowance or gratuity, or any death, sickness or disability benefits, to, for, or in respect of, that director.
(4) Unless the directors decide otherwise, directors' remuneration accrues from day to day.

**Directors' expenses**

20  The company may pay any reasonable expenses which the directors properly incur in connection with their attendance at
    (a) meetings of directors or committees of directors.
    (b) general meetings, or
(c) separate meetings of the holders of any class of share or debenture of the company, or otherwise in connection with the exercise of their powers and the discharge of their responsibilities in relation to the company

**PART 3: SHARES AND DISTRIBUTIONS**

**SHARES**

**Issue and transfer of Shares**

21  (1) Shares may be issued as either partly or fully paid.
(2) Full or partial payment of shares by a shareholder shall be evidenced by a written receipt of the transfer of the relevant amount or amounts to the bank account of the company, unless otherwise determined by a resolution of the Board of Directors of the company
(3) In the event that a shareholder proposes, or is legally required, to sell, transfer, or otherwise dispose of, all or part of his, her, or its, shares in the company by whatever means, that transferring shareholder shall advise all other shareholders of this proposal or requirement on each occasion in writing with confirmation of receipt of such notification to be obtained in writing
(4) Other shareholders in the company receiving such written notification referred to in article 21 (3) above, shall have a period of thirty (30) days in which to notify the transferring shareholder in writing, with confirmation of receipt of such notification to be obtained in writing, of any intention to acquire the relevant shares in whole or in part.
(5) If all of the other shareholders indicate a valid intention to acquire the shares subject to the transfer, then they shall be entitled to acquire the said shares in proportion to their then existing shareholding in the company
(6) If some of the other shareholders decline the opportunity to acquire the said shares, or do not respond within the prescribed thirty (30) day period, the said shares shall be offered to the remaining shareholders, who may acquire the said surplus shares in proportion to their then existing shareholding in the company
(7) The consideration payable for the said shares by the other shareholder or shareholders to the transferring shareholder shall be the nominal value of the shares, or the fair market value of the shares determined having regard to all relevant economic factors and in accordance with objective criteria, at the discretion of the transferring shareholder
(8) If there is a dispute between the transferor and the transferee(s) as to the monetary amount of the fair market value of the said shares being the subject of the transfer, the fair market value shall be determined by an independent financial expert, acceptable to both the transferor and transferee, within a reasonable period of time that shall not exceed thirty (30) days from the date on which the matter was officially referred to the expert for determination in writing
(9) If the transferor and transferee cannot agree upon an independent financial expert for the purposes of article 21 (8) above, an independent financial expert shall be appointed by the local Chamber of Commerce in the area where the company's principal operations are conducted, and the determination of the said independent financial expert, made having regard to all relevant economic considerations, shall be final and binding upon the transferor and transferee
(10) The transferor shall sell, transfer or dispose of the said shares at the same price, per share, to all other shareholders who have validly indicated an intention to acquire the said shares in accordance with these articles, provided that the same sale, transfer or disposal of the said shares is concerned. A subsequent disposal would require a new share valuation
(11) If no shareholder validly notify the transferring shareholder of an intention to acquire the said shares within the thirty (30) day notice period, the transferring shareholder shall be then entitled to sell, transfer or otherwise dispose of the said shares without restriction and as he, she, or it deems fit.

**Powers to issue different classes of share**

22  (1) Subject to the articles, but without prejudice to the rights attached to any existing share, the company may issue shares with such rights or restrictions as may be determined by ordinary resolution.
(2) The company may issue shares which are to be redeemed, or are liable to be redeemed at the option of the company or the holder, and the directors may determine the terms, conditions and manner of redemption of any such shares.

**Company not to be bound by less than absolute interests**

23  Except as required by law, no person is to be recognised by the company as holding any share upon any trust, and except as otherwise required by law or the articles, the company is not in any way to be bound by or recognise any interest in a share other than the holder's absolute ownership of it and all the rights attaching to it.

**Share certificates**

24  (1) The company may issue to each shareholder, free of charge, one or more certificates in respect of the shares which that shareholder holds
(2) Each and every share certificate must specify
    (a) in respect of how many shares, and of what class, it is issued

SDGT-15665 0122

15

Exhibit 21

(b) the nominal value of those shares,
(c) that the shares are fully-paid, and
(d) any distinguishing numbers attributed to them

(3) No single certificate may be issued respect shares of more than one class
(4) If more than one person holds a share, only one certificate may be issued in respect of it
(5) All certificates must
(a) have affixed to them the company's seal, or
Be otherwise executed in accordance with the Companies Acts

**Replacement share certificates**

25  If a certificate issued in respect of a shareholder's shares is
(a) damaged or defaced; or
(b) said to be lost, stolen or destroyed
that shareholder is entitled to be issued with a replacement certificate in respect of the same shares free of charge

**Share transfers**

26  (1) Shares may be transferred by means of an instrument of transfer in any usual form, or any other form approved by the directors, which is executed by or on behalf of the transferor
(2) No fee may be charged for registering any instrument of transfer or other document relating to or affecting the title to any share
(3) The company may retain any instrument of transfer which is registered
(4) The transferor remains the holder of a share until the transferee's name is entered in the register of members as holder of it
(5) The directors may refuse to register the transfer of a share transferred other than in accordance with these articles and if they do so, the instrument of transfer must be returned to the transferee with a written notice stating the reasons for its refusal

**Transmission of shares**

27  (1) If title to a share passes to a transmittee, the company may only recognise the transmittee as having any entitlement to that share
(2) A transmittee who produces such evidence of entitlement to shares as the directors may properly require
(a) may, subject to the articles, choose either to become the holder of those shares or to have them transferred to another person; and
(b) subject to the articles, and pending any transfer of the shares to another person, has the same rights as the original holder had
(3) However, transmittees shall not have the right to attend or vote at a general meeting, or agree to a proposed written resolution, in respect of shares to which they are entitled, by reason of the holder's death or bankruptcy or otherwise, unless they become the holders of those shares

**Exercise of transmittees' rights**

28  (1) Transmittees who wish to become the holders of shares to which they have become entitled must notify the company in writing of that wish
(2) If a transmittee wishes to have a share transferred to another person, the transmittee must execute an instrument of transfer in respect of it and the transaction must be in accordance with other provisions concerning the transfer of shares contained in these articles

**Transmittees bound by prior notices**

29  If a notice is given to a shareholder in respect of shares and a transmittee is entitled to those shares, the transmittee is bound by the notice if it was given to the shareholder before the transmittee's name has been entered in the register of members

DIVIDENDS AND OTHER DISTRIBUTIONS

**Procedure for declaring dividends**

30  (1) The company may by ordinary resolution declare dividends, and the directors may decide to pay interim dividends
(2) A dividend must not be declared unless the directors have made a recommendation as to its amount. Such a dividend must not exceed the amount recommended by the directors
(3) No dividend may be declared or paid unless it is in accordance with shareholders' respective rights
(4) Unless the shareholders' resolution to declare, or directors' decision to pay, a dividend, or the terms on which shares are issued, specify otherwise, it must be paid by reference to each shareholder's holding of shares on the date of the resolution or decision to declare or pay it
(5) If the company's share capital is divided into different classes, no interim dividend may be paid on shares carrying deferred or non-preferred rights if, at the time of payment, any preferential dividend(s) is or are in arrears
(6) The directors may pay at intervals any dividend payable at a fixed rate if it appears to them that the profits available for distribution justify the payment
(7) If the directors act in good faith, they shall not incur any liability to the holders of shares conferring preferred rights for any loss they may suffer by the lawful payment of an interim dividend on shares with deferred or non-preferred rights

**Payment of dividends and other distributions**

31  (1) Where a dividend or other sum being a distribution is payable in
respect of a share, it must be paid by one or more of the following means
(a) by transfer to a bank or building society account specified by the distribution recipient either in writing or as the directors may otherwise decide,
(b) by sending a cheque made payable to the distribution recipient by post to the distribution recipient at his, her, or its last registered address (if the distribution recipient is a holder of the share) or, in any other case, to an address specified by the distribution recipient either in writing or as the directors may otherwise decide,
(c) by sending a cheque made payable to such person by post to such person at the address the distribution recipient has specified either in writing or as the directors may otherwise decide, or
(d) by any other means of payment as the directors agree with the distribution recipient either in writing or by such other means as the directors decide
(2) In the articles, "the distribution recipient" means, in respect of a share in respect of which a dividend or other sum is payable
(a) the holder of the share, or
(b) if the share has two or more joint holders, whichever of them is named first in the register of members, or
(c) if the holder is no longer entitled to the share by reason of death or bankruptcy, or
otherwise by operation of law, the transmittee

**No interest on distributions**

32  The company shall not pay interest on any dividend or other sum payable in respect of a share unless otherwise provided by
(a) the terms on which the share was issued, or
(b) the provisions of another agreement between the holder or holders of that share and the company

**Unclaimed distributions**

33  (1) All dividends or other sums which are
(a) payable in respect of shares, and
(b) unclaimed after having been declared or become payable
may be invested or otherwise made use of by the directors for the benefit of the company until claimed
(2) The payment of any such dividend or other sum into a separate account does not make the company a trustee in respect of it
(3) If
(a) twelve (12) years or more have passed from the date upon which a dividend or other sum became due for payment, and
(b) the distribution recipient has not claimed it
the distribution recipient is no longer entitled to that dividend or other sum and it ceases to remain owing by the company

**Non-cash distributions**

34  (1) Subject to the terms of issue of the share in question, the company may, by ordinary resolution on the recommendation of the directors, decide to pay all or part of a dividend or other distribution payable in respect of a share by transferring non-cash assets of equivalent value (including, without limitation, shares or other securities in any company)
(2) For the purposes of paying a non-cash distribution, the directors may make whatever arrangements they think fit, including, where any difficulty arises regarding the distribution
(a) fixing the value of any assets,
(b) paying cash to any distribution recipient on the basis of that value in order to adjust the rights of recipients, and
(c) vesting any assets in trustees

**Waiver of distributions**

35  Distribution recipients may waive their entitlement to a dividend or other distribution payable in respect of a share by giving the company notice in writing to that effect, but if
(a) the share has more than one holder, or
(b) more than one person is entitled to the share, whether by reason of the death or bankruptcy of one or more joint holders, or otherwise
the notice is not effective unless it is expressed to be given, and signed, by all the holders or persons otherwise entitled to the share

CAPITALISATION OF PROFITS

**Authority to capitalise, and appropriation of capitalised sums**

36  (1) Subject to the articles, the directors may, if they are so authorised by
an ordinary resolution,
(a) decide to capitalise any profits of the company (whether or not they are available for distribution) which are not required for paying a preferential dividend, or any sum standing to the credit of the company's share premium account or capital redemption reserve, and

(b) appropriate any sum which they so decide to capitalise (a "capitalised sum") to the persons who would have been entitled thereto if it were distributed by way of dividend (the "persons entitled") and in the same proportions
(2) Capitalised sums must be applied
    (a) on behalf of the persons entitled, and
    (b) in the same proportions as a dividend would have been distributed to them
(3) Any capitalised sum may be applied in paying-up new shares of a nominal amount equal to the capitalised sum which are then allotted credited as fully paid to the persons entitled or as they may direct
(4) A capitalised sum which was appropriated from profits available for distribution may be applied in paying-up new debentures of the company which are then allotted credited as fully paid to the persons entitled or as they may direct
(5) Subject to the articles the directors may
    (a) apply capitalised sums by paying-up a mix of new shares and debentures as set out paragraphs (3) and (4) above;
    (b) make such arrangements as they think fit to deal with shares or debentures becoming distributable in fractions under this article (including the issuing of fractional certificates, or the making of cash payments); and
    (c) authorise any person to enter into an agreement with the company on behalf of all the persons entitled which is binding upon them in respect of the allotment to them of shares or debentures under this article

Exhibit 21

## PART 4: DECISION-MAKING BY SHAREHOLDERS
## ORGANISATION OF GENERAL MEETINGS

**Attendance and speaking at general meetings**

37  (1) A person is able to exercise the right to speak at a general meeting when that person is in a position to communicate during the meeting to all those attending, any information or opinions which that person has on the business of the meeting
    (2) A person is able to exercise the right to vote at a general meeting when
        (a) that person is able to vote, during the meeting, on resolutions put to the vote at the meeting, and
        (b) that person's vote can be taken into account in determining whether or not such resolutions are passed at the same time as the votes of all the other persons attending the meeting
    (3) The directors may make whatever arrangements they consider appropriate to enable those attending a general meeting to exercise their rights to speak or vote at it
    (4) In determining attendance at a general meeting, it is immaterial whether any two or more members attending it are in the same place as each other
    (5) Two or more persons who are not in the same place as each other attend a general meeting if their circumstances are such that, if they have (or were to have) rights to speak and vote at that meeting, they are (or would be) able to exercise them

**Quorum for general meetings**

38  (1) No business other than the appointment of the chairman of the meeting is to be transacted at a general meeting if the persons attending it do not constitute a quorum
    (2) The quorum for shareholder meetings shall not be less than two, unless there is a sole shareholder and unless otherwise fixed it shall be two

**Chairing general meetings**

39  (1) If the directors have appointed a chairman, the chairman shall chair general meetings if present and willing to do so
    (2) If the directors have not appointed a chairman, or if the chairman is unwilling to chair the meeting, or is not present within ten minutes of the time at which a meeting was due to start
        (a) the directors present, or
        (b) (if no directors are present) the meeting
    must appoint a director or shareholder to chair the meeting, and the appointment of the chairman of the meeting must be the first business of the meeting
    (3) The person chairing a meeting in accordance with this article is referred to as "the chairman of the meeting"

**Attendance and speaking by directors and non-shareholders**

40  (1) Directors may attend and speak at general meetings, whether or not they are shareholders
    (2) The chairman of the meeting may permit other persons who are not
        (a) shareholders of the company, or
        (b) otherwise entitled to exercise the rights of shareholders in relation to general meetings,
    to attend and speak at a general meeting

**Adjournment**

41  (1) If the persons attending a general meeting within half an hour of the time at which the meeting was due to start do not constitute a quorum, or if during a meeting a quorum ceases to be present, the chairman of the meeting must adjourn it
    (2) The chairman of the meeting may adjourn a general meeting at which a quorum is present if
        (a) the meeting consents to an adjournment, or
        (b) it appears to the chairman of the meeting that an adjournment is necessary to protect the safety of any person attending the meeting or ensure that the business of the meeting is conducted in an orderly manner
    (3) The chairman of the meeting must adjourn a general meeting if directed to do so by the meeting
    (4) When adjourning a general meeting, the chairman of the meeting must
        (a) either specify the time and place to which it is adjourned or state that it is to continue at a time and place to be fixed by the directors  and
        (b) have regard to any directions as to the time and place of any adjournment which have been given by the meeting
    (5) If the continuation of an adjourned meeting is to take place more than fourteen (14) days after it was adjourned, the company must give at least seven (7) clear days' notice of it (that is, excluding the day of the adjourned meeting and the day on which the notice is given)
        (a) to the same persons to whom notice of the company's general meetings is required to be given, and
        (b) that notice shall contain the same information which such notice is required to contain
    (6) No business may be transacted at an adjourned general meeting which could not properly have been transacted at the meeting if the adjournment had not taken place

### VOTING AT GENERAL MEETINGS

**Voting : general**

42  A resolution put to the vote of a general meeting must be decided on a show of hands unless a poll is duly demanded in accordance with the articles

**Errors and disputes**

43  (1) No objection may be raised to the qualification of any person voting at general meeting except at the meeting or adjourned meeting at which the vote objected to is tendered, and every vote not disallowed at the meeting is valid
    (2) Any such objection must be referred to the chairman of the meeting, whose decision is final

**Poll votes**

44  (1) A poll on a resolution may be demanded
        (a) in advance of the general meeting where it is to be put to the vote, or
        (b) at a general meeting, either before a show of hands on that resolution, or immediately after the result of a show of hands on that resolution is declared
    (2) A poll may be demanded by
        (a) the chairman of the meeting,
        (b) the directors,
        (c) two or more persons having the right to vote on the resolution, or
        (d) a person or persons representing not less than one-tenth of the total voting rights of all those shareholders having the right to vote on the resolution
    (3) A demand for a poll may be withdrawn if
        (a) the poll has not yet been taken, and
        (b) the chairman of the meeting consents to the withdrawal
    (4) Polls must be taken immediately and in such manner as the chairman of the meeting directs

**Content of proxy notices**

45  (1) Proxies may only validly be appointed by a notice in writing (a "proxy notice") which
        (a) states the name and address of the shareholder appointing the proxy;
        (b) identifies the person appointed to be that shareholder's proxy and the general meeting in relation to which that person is appointed,
        (c) is signed by or on behalf of the shareholder appointing the proxy, or is authenticated in such manner as the directors may determine, and
        (d) is delivered to the company in accordance with the articles and any instructions contained in the notice of the general meeting to which they relate
    (2) The company may require proxy notices to be delivered in a particular form, and may specify different forms for different purposes.
    (3) Proxy notices may specify how the proxy appointed under them is to vote (or that the proxy is to abstain from voting) on one or more resolutions
    (4) Unless a proxy notice indicates otherwise, it must be treated as
        (a) allowing the person appointed under it as proxy discretion as to how to vote on any ancillary or procedural resolutions put to the meeting, and
        (b) appointing that person as a proxy in relation to any adjournment of the general meeting to which it relates as well as the meeting itself

**Delivery of proxy notices**

46  (1) A person who is entitled to attend, speak or vote (either on a show of hands or on a poll) at a general meeting remains so entitled in respect of that meeting or any adjournment of it, notwithstanding that a valid proxy notice has been delivered to the company by or on behalf of that person
    (2) An appointment under a proxy notice may be revoked by delivering to the company a notice in writing given by or on behalf of the person by whom or on whose behalf the proxy notice was given
    (3) A notice revoking a proxy appointment only takes effect if it is delivered before the start of the meeting or adjourned meeting to which it relates
    (4) If a proxy notice is not executed by the person appointing the proxy, it must be accompanied by written evidence of the authority of the person who executed it to execute it on behalf of the appointor

**Amendments to resolutions**

SDGT-15665 0124

17

47 (1) An ordinary resolution to be proposed at a general meeting may be amended by ordinary resolution if,

    (a) notice of the proposed amendment is given to the company in writing by a person entitled to vote at the general meeting at which it is to be proposed not less than 48 hours before the meeting is to take place (or such later time

    as the chairman of the meeting may determine), and

    (b) the proposed amendment does not, in the reasonable opinion of the chairman of the meeting, materially alter the scope of the resolution.

(2) A special resolution to be proposed at a general meeting may be amended by ordinary resolution, if

    (a) the chairman of the meeting proposes the amendment at the general meeting at which the resolution is to be proposed, and

    (b) the amendment does not go beyond what is necessary to correct a grammatical or similar error in the resolution.

(3) If the chairman of the meeting, acting in good faith, wrongly decides that an amendment to a resolution is not in order, the chairman's error does not invalidate the vote on that resolution.

Exhibit 21

## PART 5: ADMINISTRATIVE ARRANGEMENTS

**Means of communication to be used**

48 (1) Subject to the articles, anything sent or supplied by or to the company under the articles may be sent or supplied in any way in which the Companies Act 2006 provides for documents or information which are authorised or required by any provision of that Act to be sent or supplied by or to the company

(2) Subject to the articles, any notice or document to be sent or supplied to a director in connection with the taking of decisions by directors may also be sent or supplied by the means by which that director has requested that they be sent or supplied with such notices or documents

(3) A director may agree with the company that notices or documents sent to that director in a particular way are to be deemed as having been received within a specified time of their having been sent, and for the specified time to be less than two (2) complete working days

**Company seals**

49 (1) Any common seal may only be used by the authority of the directors

(2) The directors may decide by what means and in what form any common seal is to be used

(3) Unless otherwise decided by the directors, if the company has a common seal and it is affixed to a document, that document must also be signed by at least one authorised person in the presence of a witness who attests the signature of that person

(4) For the purposes of this article, an authorised person is

    (a) any director of the company;

    (b) the company secretary (if any)

    (c) any person authorised by the directors for the purpose of signing documents to which the common seal is applied

**No right to inspect accounts and other records**

50 Except as provided by law, or authorised by the directors or an ordinary resolution of the company, no person is entitled to inspect any of the company's accounting or other records or documents merely by virtue of being a shareholder

**Provision for employees on cessation of business**

51 The directors may decide to make provision for the benefit of persons employed or formerly employed by the company or any of its subsidiaries (other than a director or former director or shadow director) in connection with the cessation or transfer to any person of the whole or part of the undertaking of the company or that subsidiary

DIRECTORS' INDEMNITY AND INSURANCE

**Indemnity**

52 (1) Subject to sub-paragraph (2) below, a relevant director of the company or an associated company may be indemnified out of the company's assets against

    (a) any liability incurred by that director in connection with any negligence, default, breach of duty or breach of trust in relation to the company or an associated company,

    (b) any liability incurred by that director in connection with the activities of the company or an associated company in its capacity as a trustee of an occupational pension scheme (as defined in section 235(6) of the Companies Act 2006), or

    (c) any other liability incurred by that director as an officer of the company or an associated company

(2) This article does not authorise any indemnity which would be prohibited or rendered void by any provision of the Companies Acts or by any other provision of law

(3) In this article

    (a) companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate, and

    (b) a "relevant director" means any director or former director of the company or an associated company

**Insurance**

53 (1) The directors may decide to purchase and maintain insurance, at the expense of the company, for the benefit of any relevant director in respect of any relevant loss

(2) In this article

    (a) a "relevant director" means any director or former director of the company or an associated company;

    (b) a "relevant loss" means any loss or liability which has been or may be incurred by a relevant director in connection with that director's duties or powers in relation to the company, any associated company or any pension fund or employees' share scheme of the company or associated company, and

    (c) companies are associated if one is a subsidiary of the other or both are subsidiaries of the same body corporate

**Lien**

54 (1) With respect to any shareholder indebted to the company in any way, the company shall retain a first and paramount lien in respect to all shares registered in the name of the indebted shareholder, irrespective of whether the relevant shares are fully paid or otherwise

(2) Unless determined otherwise by the directors, the company's lien over shares falling within the ambit of sub-paragraph 54 (1) above shall have priority over any third party claim or claims or interest with respect to the relevant shares and includes any dividends payable by the company in relation to the said shares and the proceeds of sale in the event that the company's lien is ultimately enforced

(3) In the event that the company has decided to enforce the lien with respect to the shares falling within the ambit of sub-paragraph 54 (1) above, the director or directors shall send a written notice of enforcement of the lien to the registered holder or holders or the legally entitled beneficiaries of the relevant shares, and such notice shall specify the monetary amount outstanding, include a final demand for full payment within fourteen (14) days and state the company's intention to sell the shares in the event of non-payment

(4) In the event that the company has sold the shares falling within the ambit of sub-paragraph 54 (1) above, the directors may such take action necessary to implement and give effect to the transfer of the said shares in accordance with the provisions of these articles

(5) In the event that the proceeds of the sale of the said shares falling within the ambit of sub-paragraph 54 (1) exceed the debt owed to the company, the surplus monetary amount, less all reasonable costs of enforcement incurred by the company, shall be returned to the registered holder or holders or the legally entitled beneficiaries of the relevant shares, provided that the relevant share certificate or certificates have been returned to the company for cancellation

(6) A statutory declaration by a director or company secretary confirming the office held by the said signatory in relation to the company and that the said shares subject to the lien have been sold to a third party shall constitute sufficient evidence as to the same

**Place of Jurisdiction and Choice of Law**

55 Subject to the articles, to the Companies Acts and to other local legislative provisions that may be applicable in any particular relevant circumstances, all legal disputes between or involving one or more shareholders, directors, company secretary and the company, the disputed subject matter which is an issue or issues involving one or more transactions between some or all of the aforementioned parties and the company involving matters relating to these articles or governed by the Companies Acts, shall require that formal legal proceedings in each case be commenced in the legal jurisdiction where the company's principal operations are conducted, as evidenced from the filing and content of the taxation returns of the company during the previous three (3) years, or since the date of incorporation of the company in the case of a period being less than three (3) years, prior to the date of the filing of the relevant legal proceedings, and such proceedings shall be governed in accordance with the laws of the territory where the registered office of the company is situate, be that in England and Wales, or Northern Ireland, or Scotland

Evidentiary Memorandum

Exhibit 22 Withheld in Full

Non-Responsive

Bates Numbers: SDGT-15665 0126-0127

Evidentiary Memorandum

Exhibit 23 Withheld in Full

Non-Responsive


Bates Numbers: SDGT-15665 0128-0129

Evidentiary Memorandum

Exhibit 24 Withheld in Full

Non-Responsive

Bates Numbers: SDGT-15665 0130-0133

Evidentiary Memorandum

Exhibit 25 Withheld in Full

Non-Responsive

Bates Numbers: SDGT-15665 0134-0138

Exhibit 26

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

*WARNING: This document is FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE (FOUO/LES). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552) or executive privilege. It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO/LES information and is not to be released to any personnel who do not have a valid "need-to-know," the public or a foreign government without prior approval of an authorized CBP official. The information is to be used by (Department of the Treasury/OFAC) for designation purposes only and any other use or further dissemination is prohibited unless prior written authorization is provided by an authorized CBP official.*

February 14, 2019

Office of Foreign Assets Control
1500 Pennsylvania Ave NW, Washington, DC 20220

█████████████

In response to your request for information on Wael Bazzi, CBP/NTC███ has provided the following biographic information.  The below biographic information is considered FOR OFFICIAL USE ONLY/LAW ENFORCEMENT SENSITIVE, however has been cleared by the CBP Privacy Office for OFAC's use in the designation process, including release into the public domain if/when the individual is sanctioned. Please let me know if you have any questions.

██████████████

Customs and Border Protection Officer
National Targeting Center-████████████████

**Requested Information**

Individual 1: Wael BAZZI, DOB ████/1989

- Belgian Passport EN312261, Expiring 9/7/2023

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

SDGT-15665 0139

Evidentiary Memorandum

Exhibit 27 Withheld in Full

Bates Numbers: SDGT-15665 0140-0141

Evidentiary Memorandum

Exhibit 28 Withheld in Full

Non-Responsive


Bates Number: SDGT-15665 0142

Evidentiary Memorandum

Exhibit 29 Withheld in Full

Non-Responsive

Bates Numbers: SDGT-15665 0143-0146

Druze | Definition of Druze by Merriam-Webster

Exhibit 30



SINCE 1828
Menu

- 
- 
- 

- JOIN MWU

  Gain access to thousands of additional definitions and advanced search features—ad free! JOIN NOW

- GAMES
- BROWSE THESAURUS
- WORD OF THE DAY
- VIDEO
- MORE
  WORD OF THE DAY VIDEO WORDS AT PLAYFAVORITES
- WORDS AT PLAY
- FAVORITES

Facebook Twitter YouTube Instagram

Druze



dictionary thesaurus

- JOIN MWU
- GAMES
- THESAURUS
- WORD OF THE DAY
- VIDEO
- WORDS AT PLAY
- FAVORITES

Follow: Facebook Twitter YouTube Instagram

# Druze

noun, often attributive

\ ˈdrüz 🔊 \
variants: or Druse
plural Druze or Druzes or Druse or Druses

## Definition of *Druze*

: a member of a religious sect originating among Muslims and centered in Lebanon and Syria

## First Known Use of *Druze*

1855, in the meaning defined above

## History and Etymology for *Druze*

Arabic *Durūz*, plural, from Muḥammad ibn-Ismaʿīl al-*Darazī* †1019 Muslim religious leader

Keep scrolling for more

## Learn More about *Druze*

Share *Druze*



Resources for *Druze*

 Time Traveler! Explore the year a word first appeared ○

## Dictionary Entries near *Druze*

druthers

druv

druxy

Druze

dry

dryad

dryas

## Statistics for *Druze*

Look-up Popularity

Bottom 30% of words

Time Traveler for *Druze*

## The first known use of *Druze* was in 1855

See more words from the same year

More from Merriam-Webster on *Druze*

Rhyming Dictionary: Words that rhyme with *Druze*



SDGT-15665 0148

Evidentiary Memorandum

Exhibit 31 Withheld in Full

Bates Numbers: SDGT-15665 0149-0150

Evidentiary Memorandum

Exhibit 32 Withheld in Full

Bates Numbers: SDGT-15665 0151-0154

# ·Evidentiary Memorandum
# Exhibit 33 Withheld in Full

# Bates Numbers: SDGT-15665 0155-0156

Releasable Information from Exhibit 33:

Place of Birth: FREETOWN SIERRA LEONE (SLEO)

Home Address: EGLANTIERLAAN 15, ANTWERP, ANTWEPEN 2020, Belgium

National Identification Number: 89103150321

## Resources (/resources)

Advisories/Bulletins/Fact
Sheets
(/resources/advisoriesbulletinsfact-
sheets)

Filing Information
(/resources/filing-
information)

Financial Institutions
(/resources/financial-
institutions)

FinCEN Exchange
(/resources/financial-
crime-enforcement-
network-exchange)

**International
(/resources/international-
programs)**

**The Egmont Group of
Financial Intelligence
Units
(/resources/international/egmont-
group-financial-
intelligence-units)**

The Financial Action Task
Force
(/resources/international/financial-
action-task-force)

Transnational Organized
Crime
(/resources/international/combating-

SDGT-15665 0157

Exhibit 34

transnational-organized-
crime)

Law Enforcement
(/resources/law-
enforcement-overview)

SAR Stats (/reports/sar-
stats)

Statutes and Regulations
(/resources/fincens-
mandate-congress)


**Quick Links**

Significant International AML/CFT
Events (/significant-international-
amlcft-events)

2014-2015 Egmont Group Annual
Report
(https://egmontgroup.org/en/filedepot_download/1660/22)

FinCEN Statement Noting the
Release of the Egmont Group's
White Paper on Enterprise-wide
STR Sharing (/fincen-statement-
noting-release-egmont-groups-
white-paper-enterprise-wide-str-
sharing-issues-and)

Section 311 (/resources/statutes-
regulations/311-special-measures)

Egmont Group
(http://www.egmontgroup.org/)

FATF (http://www.fatf-
gafi.org/pages/0,2987,en_32250379_32235720_1_1_1_1_1,00.html)

APG (http://www.apgml.org/)

CFATF (http://www.cfatf.org/)

MONEYVAL
(http://www.coe.int/t/dghl/monitoring/moneyval/)

SDGT-15665 0158

EAG
(http://www.eurasiangroup.org/)

ESAAMLG
(http://www.esaamlg.org/)

GIABA (http://www.giaba.org/)

GAFILAT (http://www.gafilat.org/)

MENAFATF
(http://www.menafatf.org/)

OFAC
(http://www.treas.gov/offices/enforcement/ofac/)

UN Office on Drugs and Crime
(http://www.unodc.org/unodc/en/money-
laundering/index.html)

IMF
(http://www.imf.org/external/np/exr/facts/aml.htm)

World Bank
(http://www.worldbank.org)

International Narcotics Control
Strategy Report
(http://www.state.gov/j/inl/rls/nrcrpt/index.htm)

# The Egmont Group of Financial Intelligence Units

The Egmont Group began in 1995 as a collection of a small number of national agencies, then referred to as "financial disclosure units" and today referred to as financial intelligence units (FIUs), seeking to explore ways of cooperation among themselves. The FIU concept has grown over the years and is now an important component of the international community's approach to combating money laundering and terrorist financing. To meet the standards of Egmont membership an FIU must be a centralized unit within a nation or jurisdiction to detect criminal financial activity and ensure adherence to laws against financial crimes, including terrorist financing and money laundering. Since its inception, the Egmont Group has grown dramatically from a small group to a recognized membership of more than 150 FIUs. The Egmont Group now has passed its first decade, and is evolving toward a structure of

SDGT-15665 0159

Exhibit 34

independent units working closely together to strengthen not only their own countries' anti-money laundering/counter-terrorism financing (AML/CFT) regime, but to strengthen the global firewall of economic resistance to money launderers and terrorist financiers.

The Egmont Group is an international network designed to improve interaction among FIUs in the areas of communications, information sharing, and training coordination. The goal of the Egmont Group is to provide a forum for FIUs around the world to improve support to their respective governments in the fight against money laundering, terrorist financing and other financial crimes. This support includes expanding and systematizing the exchange of financial intelligence information, improving expertise and capabilities of personnel employed by such organizations, and fostering better and more secure communication among FIUs through the application of technology. The Egmont Group's secure Internet system, the Egmont Secure Web, permits members to communicate with one another via secure e-mail, requesting and sharing case information as well as posting and assessing information on typologies, analytical tools and technological developments. On behalf of the Egmont Group, FinCEN maintains the Egmont Secure Web (ESW). FinCEN also developed the Egmont Group's public Web site (http://www.egmontgroup.org/), but transferred maintenance of the site to the Egmont Secretariat in 2009.

The Egmont Group is organizationally structured to meet the challenges of the volume of membership and its workload. The Egmont Committee, a group of 14 members, is an intermediary group between the heads of member FIUs and the five Egmont Working Groups: Legal, Training, Outreach, Information Technology, and Operational. This Committee addresses the administrative and operational issues facing Egmont and is comprised of seven permanent members and seven regional representatives. The seven permanent members include the Chair of each of the five Working Groups, the FIU hosting the ESW (FinCEN) and the Egmont Executive Secretary. The regional representation is based on continental groupings and includes one representative from Asia, two from Europe, two from the Americas, one from Africa, and one from Oceania. The five Working Groups are instrumental in the operations of the Egmont Group. The Legal Working Group reviews the candidacy of potential members and handles all legal aspects and matters of principle within the Egmont Group. The Training Working Group looks at ways to communicate more effectively, identifies training opportunities for FIU personnel and examines new software applications that might facilitate analytical work. The Outreach Working Group concentrates on expanding and developing the FIU global network by identifying countries that have established or are establishing FIUs. Outreach is responsible for making initial contact with potential candidate FIUs, and conducts assessments to determine if an FIU is ready for Egmont membership. The Operational Working Group is designed to foster increased cooperation among the operational divisions of the member FIUs and coordinate the development of studies and typologies – using data collected by the FIUs – on a variety of subjects useful to law enforcement. The Information Technology (IT) Working Group promotes collaboration and information sharing on IT matters among the Egmont membership, in particular looking to increase the efficiency in the allocation of resources and technical assistance regarding IT systems. The Egmont Secretariat office supports the Committee and all Working Groups and is located in Toronto, Canada. The Committee, Working Groups and Secretariat meet three times per year, including the annual plenary session.

SDGT-15665 0160

FinCEN continues its work in the Egmont Group to promote effective information sharing and networking. FinCEN sponsors new FIUs for membership in the Group, and has played a key role on projects relating to cross-border, enterprise-wide suspicious transaction information sharing within the financial sector, compiling best practices in FIU security, and advising counterparts on FIU issues relating to FATF recommendations and mutual evaluations.

Egmont Group Plenary Meetings

- Egmont Group Co-Chairs Statement on the 21st Plenary of the Egmont Group of FIUs HTML Only (http://www.egmontgroup.org/news-and-events/news/2013/07/05/co-chairs-statement-21st-egmont-plenary-2013)

  Archive (/egmont-archive)

FIUs of the world

- Americas (https://www.egmontgroup.org/en/content/americas-region)
- Asia and Pacific Region (https://www.egmontgroup.org/en/content/asia-and-pacific-region)
- East and Southern Africa Region (https://www.egmontgroup.org/en/content/east-and-southern-africa-region)
- Eurasia Region (https://www.egmontgroup.org/en/content/eurasia-region)
- Europe I Region (https://www.egmontgroup.org/en/content/europe-i-region)
- Europe II Region (https://www.egmontgroup.org/en/content/europe-ii-region)
- Middle East and North Africa Region (//www.egmontgroup.org/en/content/middle-east-and-north-africa-region)
- West and Central Africa Region (https://www.egmontgroup.org/en/content/west-and-central-africa-region)



Home (/)

Resources (/resources)

Contact (/contact)

About (/what-we-do)

Careers (/cutting-edge-opportunities)

Newsroom (/news-room)

SDGT-15665 0161

Exhibit 34

**Site Map (/sitemap)**

**Contract Opportunities (/contract-opportunities)**

USA.gov (https://www.USA.gov) | Regulations.gov (https://www.Regulations.gov) | Treasury.gov
(https://www.treasury.gov) | IRS.gov (https://www.IRS.gov) | Freedom of Information Act (FOIA) (/freedom-
information-act-foia-and-guide-accessing-fincen-information) | NO FEAR Act (https://www.treasury.gov/No-
Fear-Act/Pages/default.aspx) | Accessibility (/accessibility) | EEO & Diversity Policy (/equal-employment-
opportunity-and-diversity-policy) | Privacy Policy (/privacy-security)

SDGT-15665 0162

Evidentiary Memorandum

Exhibit 35 Withheld in Full

Bates Numbers: SDGT-15665 0163-0170

Evidentiary Memorandum

Exhibit 36 Withheld in Full

Bates Numbers: SDGT-15665 0171-0175

Evidentiary Memorandum

Exhibit 37 Withheld in Full

Bates Numbers: SDGT-15665 0176-0181

Evidentiary Memorandum

Exhibit 38 Withheld in Full

Bates Numbers: SDGT-15665 0182-0188

Evidentiary Memorandum

Exhibit 39 Withheld in Full

Bates Numbers: SDGT-15665 0189-0200

Evidentiary Memorandum

Exhibit 40 Withheld in Full


Bates Numbers: SDGT-15665 0201-0202